FIRST NATIONAL BANK OF MEADVILLE, PENNSYLVANIA, Executor of the Estate of Kenneth W. Rice, deceased, Plaintiff,

v.

NIAGARA THERAPY MANUFACTURING CORPORATION, Defendant.

Civ. A. No. 933 Erie.

United States District Court
W. D. Pennsylvania.
May 11, 1964.

Robert A. Jarvis, Pittsburgh, Pa., and F. Joseph Thomas, Meadville, Pa., for plaintiff.

John E. Britton, Erie, Pa., Marsh, Spaeder, Baur, Spaeder & Schaaf, Byron Baur, Erie, Pa., for defendant.

WILLSON, District Judge.

The plaintiff in this case is the First National Bank of Meadville, Pennsylvania, Executor under the will of Kenneth W. Rice, deceased. Mr. Rice was killed in an airplane accident at the Port Erie Airport on January 22, 1962. The complaint was filed on January 7, 1963. Plaintiff seeks damages from the defendant, Niagara Therapy Manufacturing Corporation, under the diversity jurisdiction of the Court. Defendant filed a responsive answer on February 13, 1963. Thereafter on June 24, 1963, defendant filed a motion in which it sought summary judgment alleging that the Court lacked jurisdiction because the principal place of business of defendant is at Adamsville, Crawford County, Pennsylvania, in this district, and as the plaintiff is a banking institution in the City of Meadville, also in this district, no jurisdiction exists under the diversity statute as amended 28 U.S.C.A. § 1332. That statute, of course, provides that a corporation shall be deemed a citizen in any state in which it has been incorporated, and the state in which it has its principal place of business. It is not controverted that the defendant is a Delaware corporation. The parties agreed, and the Court directed that the issue as to defendant's principal place of business be first tried. As trial judge, I heard testimony on this issue on July 22 and 23, 1963, at Erie. After hearing the evidence I orally stated to counsel that I was convinced that the principal place of business of the defendant corporation was not in Pennsylvania, and that the motion would be dismissed, and the case would thereafter be tried on the merits. The case, therefore, came on for trial on the merits on February 10, 1964, and continued for some five trial days. At the conclusion of the trial on the merits, counsel were orally informed that judgment would be entered for the plaintiff on the issue of liability, but the amount of damages would await the filing of briefs and arguments. Briefs have now been filed and the parties heard. The three issues to be covered in this Opinion are therefore those relating to jurisdiction, liability, and damages.

JURISDICTION

Defendant was incorporated under the laws of the State of Delaware in 1952 to manufacture massage devices. Manufacturing plants were located in New York and in North Carolina. On January 1, 1962, a merger of defendant's two sales companies, Niagara Distributing Corporation and Niagara Western, Inc., into the Niagara Therapy Manufacturing Corporation became effective. Subsequently the North Carolina plant was closed, and all of defendant's manufacturing activities were being carried on in Brocton, New York, at the time suit was filed on January 7, 1963.

While it is clear that defendant's manufacturing is centered in New York, defendant's products are sold by franchised distributors throughout the United States except for eight company-owned stores, one of which is situate in Pennsylvania. From the standpoint of sales, the genius behind the distribution of defendant's products is Mr. Owen K. Murphy, defendant's founder and majority stockholder. In his capacity as National Sales Manager and Director, most of his time is devoted to flying to various places throughout the country promoting the sale of defendant's products. The center of Mr. Murphy's sales activities is located at an estate-type executive headquarters at Stuart, Florida.

In corporate activity such as is shown in this case, it is often difficult to determine which is more important: manufacturing or sales. Both, of course, are interdependent and are the basis of the corporate prosperity. When Mr. Murphy first commenced business he apparently used the defendant as his manufacturing corporation and sold through two other corporations as indicated above. But on January 1, 1962, he merged his three corporations into the defendant. The situation presented then is that all the manufacturing activity, including the physical plant, machinery, and equipment, together with the manufacturing personnel is situate in New York. Many other records are maintained there. The sales activity is directed by Mr. Murphy wherever he may be. But we come back to the proposition in deciding this issue that the stated purpose of defendant at the time of incorporation was the manufacture of massage devices. This manufacturing process was first set up in the State of New York and has continued to be centered there.

The New York activities increased after the merger. Several months later all the books of original entry, including the sales books, of the corporation were moved from Adamsville, Pennsylvania, to its Brocton, New York, office and plant. The accounting and credit departments with their personnel and all accounting records and machines were also transferred from Pennsylvania to New York. Since the merger the defendant spends 40 per cent of its gross income in its New York operations. About two-thirds of its total employees work at the Brocton plant and offices. Since January 1, 1962, R. A. Morrison, Vice President in Charge of Manufacturing and Secretary-Treasurer of the corporation, has maintained his offices there.

The dominating personality in the defendant's business is unquestionably its President, Mr. Murphy. It is the type of business in which sales promotion must be continually carried on. That function is almost entirely assumed by Mr. Murphy. From the evidence it is somewhat difficult to say exactly where most of his time is spent. But if one was required to state with preciseness the headquarters of the sales activity that point would be Stuart, Florida. Also, most of the Board of Directors Meetings have been held at Stuart, and annual outings or sales meetings of the franchised dealers are held there.

We, thus, have a situation in which there are two fixed places or headquarters of the business; manufacturing in the State of New York, and sales promotion in the State of Florida. The activity in Pennsylvania including sales promotion from the Adamsville Office is minimal at best. Under the statute if the principal place of business of the defendant is in Pennsylvania then there is no diversity because unquestionably the plaintiff is a Pennsylvania institution. But clearly under the evidence the State of Pennsylvania is not the state of the principal place of business of the defendant. I have considered this evidence in the light of all the factors set forth by Judge Goodrich in Kelly v. United States Steel Corporation, 284 F.2d 850 (3d Cir. 1950), a case in which I was the trial judge. See also the recent case of Egan v. American Airlines, Inc., 324 F.2d 565 (2 Cir., 1963). In the instant case the evidence and the law requires a denial of the Motion To Dismiss because of lack of diversity of citizenship. Counsel at the suggestion of the Court have presented detailed Findings of Fact and Conclusions on this issue, and they are adopted because they are supported by a fair preponderance of the evidence.

I have read the admonition of the Supreme Court in the case of United States v. El Paso Natural Gas Company, 84 S.Ct. 1044, 1964, with regard to a trial judge's accepting findings submitted by counsel. Although I accept counsel's Findings and Conclusions, I independently came to my conclusion reached here during the course of the trial on this issue held on July 22 and 23, 1963, at Erie.

## FINDINGS OF FACT

1. The plaintiff executor is a national bank created under the laws of the United States, engaged in the banking business in the City of Meadville, Pennsylvania, is the duly appointed executor of the Estate of Kenneth W. Rice, deceased, and is a citizen of the Commonwealth of Pennsylvania.

2. Defendant is a corporation incorporated under the laws of the State of Delaware, and from the time of its incorporation on January 7, 1952, it has engaged in its principal business activity of manufacturing equipment entirely within the State of New York and elsewhere than Pennsylvania.

3. The defendant corporation was not authorized to do business in the Commonwealth of Pennsylvania until July 5, 1957.

4. Prior to the merger of the defendant corporation with the two affiliated corporations, known as Niagara Distributing Corporation and Niagara Western Corporation, both incorporated in the State of Delaware, the defendant manufactured the same type of products in the State of North Carolina, as well as at its principal plant in Brocton, New York.

5. For the year 1960, the defendant's New York corporate tax returns disclosed that 63 per cent of its average value of tangible property, 94 per cent of its gross receipts, and 83 per cent of its wages were allocated to New York, or an average of 82 per cent. The 1960 corporate tax return filed in the Commonwealth of Pennsylvania for the same year disclosed 9.7351 per cent of its tangible property, .2471 per cent of its gross receipts, and none of its wages assigned to Pennsylvania, or an average of 3.3274 per cent (Plaintiff's Exhibits Nos. 32 and 35).

6. For the year 1961, defendant's New York corporate returns showed 54.7 per cent of its value of tangible property, 51.9 per cent of its gross receipts and 99.3 per cent of its wages assignable to New York, or an average of 66.8 per cent. The defendant's Pennsylvania tax returns for 1961 disclosed that it had assigned 11.7298 per cent of its tangible property, .6643 per cent of its gross receipts, and none of its wages to Pennsylvania, or an average of 4.1314 per cent (Plaintiff's Exhibits Nos. 33 and 36).

7. For the year 1962, the defendant's New York corporate returns disclosed that 40 per cent of its tangible property, 41.3 per cent of its gross receipts, and 47 per cent of its wages were allocated to New York, or an average of 42.8 per cent. In its tax returns for the same year in Pennsylvania, the defendant assigned 16.9946 per cent of its tangible property, 4.1538 per cent of its gross receipts and 37.3013 per cent of its wages to Pennsylvania, or an average of 19.4833 per cent (Plaintiff's Exhibits Nos. 34 and 37).

8. Defendant began business in New York State on the date of its incorporation, January 7, 1952, manufacturing massage equipment and has continued to engage in that principal business activity until this suit was filed and thereafter. The defendant was not authorized to do business in Pennsylvania until July 5, 1957.

9. Defendant's affiliate corporations prior to the merger of January 1, 1962, were Niagara Western, Inc., and Niagara Distributing Corporation, both Delaware corporations, which were engaged in sales and distribution of the defendant's products throughout the United States. Mr. Owen K. Murphy, owner of the majority stock interests in these two corporations, as well as the defendant corporation, was President and Chief Executive Officer, as well as National Sales Manager and Director.

10. Mr. Murphy as the founder and organizer is the real brains of the entire business operation. He is a sales genius and directs all operations and makes all major policy decisions of the defendant corporation, the center of his activities being located at Stuart, Florida, where the defendant has invested $250,000.00 in an estate-type executive headquarters.

11. Defendant's products are sold generally by franchised distributors

throughout the United States. There are eight company-owned stores only one of which is in the State of Pennsylvania, which latter was acquired by the company because of the distressed financial conditions of the previous owner. The franchise agreements are executed for the defendant by Mr. Murphy, at Stuart, Florida.

12. Although there appeared to be several directors' meetings at the Adamsville, Pennsylvania, office of the defendant within the past three years, the Board of Directors has never overruled Mr. Murphy on policy making or any other matter of importance to the corporate operation. Informal directors' meetings were held frequently in Florida, and important decisions were made there before the formal meetings were held at Adamsville, Pennsylvania. One of these Florida meetings of major importance was that involving the merger of the two sales companies, Niagara Distributing Corporation and Niagara Western, Inc., into the defendant, Niagara Therapy Manufacturing Corporation, which became effective as of January 1, 1962. Also, as recent as September 1962, a formal directors' meeting was held at the office and plant of the defendant at Brocton, New York.

13. At the time the merger of the other two sales corporations into the defendant corporation became effective on January 1, 1962, the principal officers of the corporation other than Mr. Murphy worked out of the Adamsville, Pennsylvania, office where all the accounts and books of original entry of the corporation were kept, and from where the advertising material of the defendant was sent out to distributors and others. Subsequent to the reorganization and merger, two of the principal officers, Donegan and Marrison, resigned from the company on or about April 1, 1962. Several months later, the defendant's accounting and credit departments, personnel, accounting machines, and all books of original entry, including the sales books, were transferred to its Brocton, New York, office and plant.

From that time R. A. Morrison, Vice President in Charge of Manufacturing and Secretary-Treasurer of the corporation, maintained his offices there. Mr. Murphy continued to be the National Sales Director, as well as Chief Executive Officer of the defendant with offices at Stuart, Florida. Also, he and his wife maintained their residence there.

14. After the merger of January 1, 1962, 40 per cent of the total income dollars of the defendant corporation was spent in its manufacturing activities in the State of New York. The remaining 60 per cent thereof was spent in its various sales and promotion activities throughout the United States.

15. As of January 15, 1962, the defendant had seventy-one full time employees at its plant and offices at Brocton, New York, where all of its manufacturing activities were carried on. Fifty-eight employees were located at its Adamsville, Pennsylvania, office and fourteen employees were located in states other than New York or Pennsylvania. Subsequent to the merger, and as of January 1, 1963, the defendant had eighty-six full time employees at its Brocton office and factory, between twenty and twenty-four employees at its Adamsville, Pennsylvania, office, and fourteen other employees in other states.

16. In two deeds dated July 30, 1962, which conveyed certain property in Crawford County, Pennsylvania, from Omar Realty Corporation to Niagara Therapy Manufacturing Corporation, the defendant herein, which were prepared by defendant's corporate counsel and executed by the same officers who are the principal executive officers of the defendant corporation, the defendant is described as follows therein:

> "Niagara Therapy Manufacturing Corporation, a corporation under the laws of the State of Delaware, having its domicile in the Village of Brocton, County of Chautauqua, State of New York,"

and in the certificate of residence, the defendant's precise residence is given as

"Brocton, New York" (Plaintiff's Exhibits Nos. 40 and 41).

17. Subsequent to the merger of January 1, 1962, the surviving corporation continued to be known as "Niagara Therapy *Manufacturing* Corporation," and all of its manufacturing activities continued to be carried on in the State of New York where its corporate activities were thereupon increased by the closing of its North Carolina plant and the transfer of the accounting and credit departments to its Brocton, New York, office and factory, together with physical transfer of all of the books of original entry, the accounting records, and accounting machines.

18. The day-to-day corporate activities of the defendant diminished in Pennsylvania between the date of the corporate merger and the filing of the complaint and increased in the State of New York.

19. The State of New York and not the Commonwealth of Pennsylvania is the principal place of business of the defendant corporation.

LIABILITY

Kenneth W. Rice of Meadville, Pennsylvania, was general counsel for the defendant, Nigara Therapy Manufacturing Corporation. Edward R. Donegan was the Vice President of the corporation. Roger G. Counselman was the regularly employed pilot of the Aero-Commander 680 B aircraft owned by the defendant. On January 21, 1962, Mr. Counselman piloted the aircraft with Mr. Rice and Mr. Donegan as passengers from Meadville to Buffalo for the purpose of taking a deposition in that city the next morning. It was the contemplation of the parties that the deposition would be completed prior to noon on the 22nd, and that they would return to Meadville in the afternoon. But on the morning of January 22, the Buffalo Airport was closed until noon due to bad weather. For several hours there was uncertainty as to whether or not the flight could be made at any time that day. Messrs. Rice and Donegan made reservations to return to Meadville by train. Mr. Counselman

went to the airport in the early afternoon. At about 2:00 p. m. he notified his passengers that the weather was getting better and that the flight possibly could be made at about 3:00 p. m. The aircraft with Mr. Counselman piloting and Messrs. Rice and Donegan as passengers took off from the Buffalo Airport under an instrument flight plan at 3:25 on the afternoon of January 22, 1962. Mr. Counselman had secured certain weather information on reaching the airport, and a further weather check was made by him just before take-off. It is undisputed, however, that shortly after take-off ice was encountered which steadily built up on the aircraft and which all witnesses agree was the proximate cause of the crash at the Port Erie Airport, as a result of which Mr. Rice met his death.

Plaintiff contends and strongly urges that the evidence discloses that the pilot Counselman was negligent in taking off from Buffalo under the weather conditions existing and in the face of unfavorable weather forecasts. This was especially so urges plaintiff because the aircraft was not equipped with any deicing boots or any other method of removing ice from the surface of the aircraft. Further says plaintiff, the negligence of the pilot in taking off was compounded by his failure to return to the Buffalo Airport which he had an opportunity to do very soon after encountering ice. In any event says plaintiff, the pilot should have turned back to Buffalo at a point no further on than the Crystal Beach Intersection, which was 21 miles from the Buffalo Airport.

As it is undisputed that icing was the contributing factor in the crash, the issue is clearly presented as to whether Mr. Counselman, the person in sole charge of the flight, was negligent in taking off from Buffalo to Meadville under the conditions which faced him.

Mr. Donegan, the Vice President, sat in the co-pilot's seat. He had had considerable experience riding with Mr. Counselman in that aircraft. His testimony was that immediately after take-off upon entering the clouds light ice began

to develop on the windshield. After the plane reached an elevation of 400 feet, ice continued to build up rapidly on the leading edges of the wings, on the windshield, and on the engine nacelles. This witness indicated that the propellers were throwing off chunks of ice which "banged" against the sides of the fuselage. When the plane reached the Crystal Beach Intersection, the pilot increased engine power. Before the plane reached the Brocton Interchange, the pilot once again increased his engine power. Nevertheless, the arrival at the Brocton Interchange which is approximately the halfway point between Buffalo and Erie was eleven minutes later than the estimated arrival time. By the time the plane passed the Brocton Interchange the ice had reached a thickness of five or six inches. At this point the pilot called the Port Erie Airport, reported the icing, and requested and received permission to descend from 4000 to 3500 feet. The plane finally broke out of the overcast at about 2700 foot elevation. At this lower elevation ice on the plane began breaking off, but chunks of ice could still be seen on the leading edge of the left wing, one of which was one foot in length. Because a view from the cockpit could be had only forward and with but a short view to the sides, neither the pilot nor the passenger Donegan could make any observation as to the quantity or extent of ice on the plane's controls and other surface areas in back of the cockpit. However, the pilot flew past the Port Erie Airport and turned south indicating to the control tower that he would take a look toward Meadville, which was his destination, to determine whether he would continue his flight VFR. Upon sighting cloud formations, he returned to Port Erie Airport. The Erie Control Tower cleared the plane for a landing on Runway 24. On the final approach the pilot decreased power, and the plane went into a nose dive and stall. He then increased power, and the plane recovered. The pilot indicated in his testimony, however, that on his final approach, especially in the turns, his controls felt "mushy."

Continuing his approach he again decreased his power, and the plane nose dived and crashed to the earth.

Several witnesses at or near the Port Erie Airport observed the plane as it came in and noticed its difficulty and especially that the engines seemed to be laboring with power and noise similar to a take-off rather than that of a landing. At least two witnesses observed both stalls of the aircraft and the impact at the time of the crash. The witness Steinbarth was a licensed pilot. He observed the final approach and the two stalls as well as the crash. His testimony was that the right wing first struck the ground, and the plane crashed just short of the paved portion of the runway. Some three witnesses got to the aircraft immediately after the crash. William Darion testified that the pilot told him at the scene and before the pilot was removed from the plane that the "plane iced up and he couldn't hold it" and "he had made a bad one." Earl Darion testified that the pilot remarked, "We had a bad one." The witness Apple said the pilot said, "I think I made a bad one." These witnesses and others testified as to the pieces of ice scattered about in a general area within a 50 to 100 foot radius of the point of impact. The manager of the Port Erie Airport stated that the ice was concentrated over about a 100 foot radius of the impact site, and that most of the ice was leading edge ice. He gathered up a bag of fragments of ice and placed them in the restaurant deep freeze. Photographs were made of pieces of the ice by the employees of the Federal Aviation Administration, and these pictures have been offered in evidence. Another witness, Charles Schaffer, Inspector for the FAA, testified he examined the aircraft and found no malfunction in any of the plane's equipment. He saw ice on the ground, some of which he photographed.

The evidence as to the conditions at the Buffalo Airport, and during the flight, and the landing is not in any substantial dispute. The plane was on instruments in accordance with the flight

468

plan [Exhibit 19] and in clouds with no ground visible from take-off until it broke out of the clouds over the Erie residential district.

It can be conceded that in checking weather information and especially weather forecasts, allowances must be made for uncertainties. Nevertheless, it seems to this Court that Mr. Counselman had available to him at Buffalo extensive weather information which should have indicated to him that in the area between Buffalo and Erie icing conditions would very likely be encountered. There was a United States Weather Bureau Office at the Buffalo Airport. It had all the weather information available throughout the country; especially, of course, it had available the weather maps showing the frontal systems in and about the Great Lakes area and the course of those systems toward Western New York. Mr. Counselman did not visit the U. S. Weather Bureau Office at the Buffalo Airport. His testimony was that he checked the teletype machine in the pilot's ready room and made calls to the U. S. Weather Bureau asking for pilot reports as to the weather conditions in the area. Mr. Counselman did not examine weather maps available in the Weather Bureau Office. The teletype machine transmits weather information in code. While on the witness stand Mr. Counselman was asked to interpret weather codes. He had considerable difficulty doing so.

He was aware, of course, that ice will form on an aircraft when the temperature is 32 degrees Fahrenheit or less and the aircraft is flying through precipitation such as clouds.

Before take-off he sprayed his plane with deicing fluid which, however, he conceded was practically worthless so far as efficacy was concerned.

It is certain in this case that Mr. Counselman either ignored or chose to disregard important weather advisories issued by the U. S. Weather Bureau. In this connection Exhibits 20 and 21 are important. Exhibit 20 was an advisory to light aircraft No. 3, issued by the U. S. Weather Bureau, effective from 12 o'clock p. m. to 4 o'clock p. m., January 22, 1962, and indicated moderate turbulence below 8000 feet and a chance of moderate to severe turbulence in a thunderstorm in Southwestern Pennsylvania. It also indicated moderate to heavy clear icing and precipitation on the air route between Buffalo and Erie, Pennsylvania.

Exhibit 21(a) was a forecast issued by the Cleveland Office of the U. S. Weather Bureau, effective from 1:45 p. m. and valid from 2 o'clock Monday afternoon (January 22, 1962) until 2 o'clock Tuesday morning, and indicated that there was locally moderate icing in clouds and in precipitation developing over the northern third of Ohio below 3,000 feet and spreading over Western New York and Western Pennsylvania by 9 o'clock.

Exhibit 21(b) was a pilot report issued at 2:25 p. m. by the Weather Bureau Airport Station at Cleveland which indicated that an Aero-Commander aircraft flying in the Buffalo vicinity and climbing to 10,000 feet encountered a trace of clear icing. Another pilot encountered light rime icing. From observing Mr. Counselman on the stand and listening to his testimony, this Court concludes that he failed in his duty to adequately avail himself of the information as to weather conditions with which he would be confronted on his contemplated flight to Meadville.

It is to be noticed in this case, of course, that the flight commenced in Buffalo, New York, but that the crash occurred in Pennsylvania. In the opinion of the Court, the negligence of the pilot commenced at take-off and continued throughout the flight and even occurred during the landing. It is significant that on coming out of the clouds and descending to approximately 2200 feet over the airport the plane was rapidly losing its ice. No doubt had the pilot continued to circle the airport for several more minutes a safe landing could have been made, but he had no way of knowing exactly the quantity of ice on his plane. From the evidence it is undisputed that ice on an aircraft during flight is dan-

gerous in that it interferes with the controls, but the extent of that interference is not known until an actual landing is attempted. In this case, the Court only holds the defendant to the rule of ordinary negligence. This Court is applying the principle of law as found in 8 Am.Jur.2d, Private Carrier § 69. Here the following statement occurs:

"The cases stating the duty and measure of care required of a private carrier of passengers by air are not in complete accord. But while there is some authority that the duty and measure of care required of a private carrier is the same as that required of a common carrier of passengers by air, the more general holding is that the measure of care required from a common carrier is greater that that required from a private carrier and that the duty of a private carrier by air to its passengers is to exercise ordinary care."

██ Applying the ruling of ordinary negligence, this Court does not hestitate to find that the pilot Counselman failed in his duty to exercise reasonable care in making his plans for his flight, and thereafter during the course of his flight in failing to return to Buffalo when he had the opportunity to do so. But the first point is sufficient to hold the defendant responsible for the crash. In the course of the trial this Court was much impressed with the testimony of Joseph Denardo and of the three pilots, Messrs. Leland Yeager, James Pitsenberger, and Roger Coe, of the Youngstown Airways. The latter three qualified as experts, and the Court accepts their testimony to the effect that a competent, licensed pilot in the exercise of reasonable care would not have taken off from Buffalo on the day in question in face of the weather information available to him.

The Court has not overlooked the testimony of two witnesses produced by the defendant, Captains Riley and Patterson, experienced commercial pilots employed by United Airlines, who testified on behalf of the defendant to the effect that in their opinion as experts they thought that Mr. Counselman had exercised reasonable care in his preparations for and during the flight. However, it appeared that they had been employed to investigate the crash for the defendant; they had interviewed various witnesses at the Port Erie Airport, and made certain tests and examinations. In such a situation, of course, part of their opinions was based on hearsay interviews with other persons. It is the opinion of this Court that their testimony is not persuasive and has no probative value.

██ This opinion on the issue of liability is regarded as embracing the Findings of Fact and Conclusions of Law as permitted under Rule 52. Counsel have submitted some 108 detailed Findings of Fact on the issue of liability. These have been examined but are not made a part of the opinion, as I believe that Findings are unnecessary in view of what has been said in this opinion as to the overwhelming evidence of negligence on the part of the pilot Counselman in taking off at the Buffalo Airport at the time and date as indicated.

## DAMAGES

Plaintiff brought suit under both the "Wrongful Death Statutes" (12 P.S. §§ 1602–1604) and the "Survival Statute" (20 P.S. § 320.603) of Pennsylvania for the benefit of the surviving widow and the two daughters of the decedent.

On the issue of damages the Court has in mind the leading Pennsylvania cases: Pezzulli v. D'Ambrosia, 344 Pa. 643, 26 A.2d 659 (1942); Murray v. Philadelphia Transportation Co., 359 Pa. 69, 58 A.2d 323 (1948); Ferne v. Chadderton, 363 Pa. 191, 69 A.2d 104 (1949); Swartz v. Smokowitz, 400 Pa. 109, 161 A.2d 330 (1960); and Skoda v. West Penn Power Co., 411 Pa. 323, 191 A.2d 822 (1963).

It is clear from the evidence that Mr. Rice had a lucrative practice in Crawford County and northwestern Pennsylvania. He was well and favorably known to this Court as a practicing member of the Bar. The President Judge of Crawford County testified as to the type of practice en-

gaged in by Mr. Rice and the number of cases on the dockets in Crawford County Courts in which Mr. Rice was counsel. His tax returns for several years were introduced as evidence. It is conservative to say that his average net income during five years prior to his death was $25,000.00 a year. He provided generously for his family. On the day he was killed he was just four days short of his forty-ninth birthday, and thus was in the prime of his life so far as a lawyer is concerned. He had been married to his surviving wife for twelve years. He and his wife had recently completed and paid for a dwelling and furnishings therein which cost $65,000.00. He owned a half interest in each of two small office buildings. His interest in one building was appraised at $9,200.00 and in the other building was appraised at $17,500.00. He had accumulated securities valued at $63,000.00 at the time of his death. He himself drove a Cadillac automobile and provided his wife with an Oldsmobile 88. Both his daughters were in college at the time Mr. Rice died. The foregoing is mentioned not as showing the measure of the damages to be awarded in this case, but as indicating the earning capacity of the decedent, as the record indicates that his accumulations and earnings came from his law practice and not from inheritance or gifts.

■■ This Court will apply the principle announced in Ferne v. Chadderton, 363 Pa. at 197, 69 A.2d at 107, with respect to the amounts which the plaintiff is to recover for the benefit of the wife and daughters. That opinion says the rule is:

"Under the Death Statutes the administratrix was entitled to recover for the benefit of the daughter and herself as widow the amount of the pecuniary loss they suffered by reason of decedent's death, that it to say, the present worth of the amount they probably would have received from his earnings for their support during the period of his life expectancy and while the family re-lationship continued between them, but without any allowance for mental suffering, grief, or loss of companionship; in other words, the measure of damages is the value of the decedent's life to the parties specified in the statute: Minkin v. Minkin, 336 Pa. 49, 55, 7 A.2d 461, 464. Recovery is also allowed for the expense incurred for medical and surgical care, for nursing of the deceased, and for the reasonable funeral expenses. Act of May 13, 1927, P.L. 992, 12 P.S. § 1604. Under the Survival Statute, 20 P.S. §§ 771, 772, the administratrix was entitled to recover for the loss of decedent's earnings from the time of the accident until the date of his death, and compensation for his pain and suffering during that period. Recovery may also be had for the present worth of his likely earnings during the period of his life expectancy, but diminished by the amount of the provision he would have made for his wife and children as above stated (thus avoiding duplication: Pezzulli, Administrator v. D'Ambrosia, 344 Pa. 643, 650, 26 A.2d 659, 662) and diminished also by the probable cost of his own maintenance during the time he would likely have lived but for the accident: Murray, Administrator, v. Philadelphia Transportation Co., 359 Pa. 69, 73, 74, 58 A.2d 323, 325."

As indicated Mr. Rice was survived by his widow, Mary T. Rice, and two daughters, Cynthia and Barbara. The older daughter, Cynthia, was born August 22, 1940, and lived with her father and Mrs. Rice in the new dwelling house. She had a room and bath for her own use. Barbara, the younger daughter, was born November 29, 1942. She lived with her mother; Mr. Rice's first wife. However, she was supported by her father. He provided her with a money allowance each month and paid for her clothing, medical and dental bills, and additional miscellaneous expenses, and paid the child's mother $50.00 a month in addition.

for maintenance. When Barbara entered Oberlin College, Mr. Rice paid for tuition, books, room, clothing, and medical and incidental expenses. She enrolled there in 1960, at which time the tuition was $1,031.00 per semester. In 1961 her college expenses were $2,047.25; in 1962, the expenses were $2,047.00. In addition, Mr. Rice gave her approximately $700.00 per year as spending money. By virtue of her father's death, Barbara was deprived of the cost of two and one half years of her college education and other living expenses, which she had been receiving from her father.

The older daughter, Cynthia, was 21 years of age at the time of her father's death, but she had one semester to complete at Wooster College. Her father paid for all of her college expenses which amounted to over $2,000.00 per year, provided her with a substantial allowance, and paid for all of her clothing, medical, and dental bills. His checking account showed that from 1958 to January 12, 1962, he had deposited $1,930.00 as spending money for Cynthia.

■ Under the evidence it is believed fair and just to award the plaintiff the sum of $7,500.00 for the loss of the contributions which the two children would have received had it not been for their father's death.

■■ The widow, Mary T. Rice, had the benefit of the generosity of a husband who provided her with the good things in life commensurate with his $25,000.00 a year income. It seems conservative of this Court to say that she had the benefit of at least $10,000.00 a year of that income. She enjoyed the use of a new automobile every two years. She had an unlimited checking account. She bought clothes of up to $2,500.00 in price annually. They lived among friends commensurate with a house and furnishings of the value of $65,000.00. Again but only as indicating the manner in which Mr. Rice spent his money, the records showed that he would borrow $20,000.00 from the bank, invest it in stock, and pay off the debt over a period of about three years. It is apparent that the rest of his money was spent in good living, as he had no cash savings at the time he died. He had been some twenty-five years in the practice of law, and it is believed his income had leveled off. But under the testimony he had a life expectancy of approximately twenty-four years on January 22, 1962. Counsel for plaintiff argues that decedent's earnings would increase during his remaining working life. This is so, says counsel, because a lawyer's earnings will increase as he advances in wisdom and maturity. On the other hand, counsel for the defendant contended that it is more likely that decedent's earnings would fall off during the remainder of his life. Balancing the two theories together, it seems to the Court that $25,000.00 a year averaged out for his life expectancy is reasonable. In this Court's opinion, Mrs. Rice had the benefit of $10,000.00 per year contributions from her husband. She received the benefit of this sum by way of her general maintenance in the home on a rather luxurious standard of living, her expenses for her clothing, medical, and incidental bills, and in the expenditure of funds for her own and her husband's pleasure. There was a two year interval between the date of death, which occurred January 22, 1962, and the trial. Mrs. Rice's pecuniary loss during that period is not reduced, so for her benefit the Executor in this instance recovers $20,000. Under the various life expectancy tables, it appears that twenty-two years is the proper number of years to be used in computing the present worth of likely earnings and contributions. Thus in Mrs. Rice's case $10,000.00 a year for twenty-two years amounts to a gross of $220,000.00. Under the tables, Am.Jur.2d Desk Book, Doc. No. 133, the present value of $1.00 per year, computed at 6 per cent as required by state law, for twenty-two years is 12.042 dollars. $10,000.00 is $120,420.00. Thus, under the Wrongful Death Acts, the Executor is entitled to recover for the benefit of Mrs. Rice, $120,420.00. Also, the Executor is claiming the sum

of $2,000.00, covering reasonable funeral and administration expenses, and this sum is awarded the Executor. Under the Wrongful Death Act then the damages are computed as follows:

Loss of contributions by the
two daughters .......... $ 7,500.00
Loss of contributions by
widow to date of trial .... 20,000.00
Loss of future contributions
to widow (reduced to present worth by 6 per cent
method) ............... 120,420.00
Funeral and administration
expenses .............. 2,000.00

TOTAL DAMAGES UNDER
WRONGFUL DEATH
ACT: $149,920.00

The damages awarded in the foregoing amount under the Wrongful Death Acts are amply supported by the evidence. In the computation of damages under the Survival Act, however, the problem is not as clearly defined.

It is this Court's experience that under the Survival Act damages to be awarded a decedent's estate are generally based on evidence which must be estimated with some degree of elasticity. There has lately been considerable discussion as to what the rule is with respect to this type of award. See a discussion in the Pennsylvania Bar Journal, Vol. 32, p. 47 (Oct. 1960), "Has The Measure Of Damages Under The Survival Act In Pennsylvania Been Modified?" In the instant case, the problem is made somewhat difficult because the record is bare of any specific testimony as to the money spent by Mr. Rice for his own maintenance during his lifetime. The last decision of the Supreme Court of Pennsylvania, Skoda v. West Penn Power Co., 411 Pa. 323, 191 A.2d 822, 829 (1963), states the rule as follows:

" 'Recovery may also be had for the present worth of his likely earnings during the period of his life expectancy, but diminished by the amount of the provision he would have made for his wife and children as above stated, thus avoiding duplication. Pezzulli, Administrator, v. D'Ambrosia, 344 Pa. 643, 650, 26 A.2d 659, 662, and diminished also by the probable cost of his own maintenance during the time he would likely have lived but for the accident. Murray, Administrator v. Philadelphia Transportation Co., 359 Pa. 69, 73, 74, 58 A.2d 323, 325.' (Emphasis supplied)".

Counsel for plaintiff strongly urge that under the rule in the various decisions, including Skoda, the award to the Executor in this case should run over $127,000.00. Although the award to be made under the Survival Statute is not to be based on savings and not to be based on accumulations, nevertheless, the history of Mr. Rice's financial status indicates that he shows not only the ability to save but also to accumulate. Following the rule, however, in Ferne v. Chadderton, and other cases, the present worth of decedent's likely earnings during the remaining period of the decedent's life expectancy is to be computed. This sum is to be diminished by the amount of the awards to the family under the Wrongful Death Acts and also diminished by the probable cost of his own maintenance during the time he would likely have lived but for the accident.

 Therefore, in accordance with the rule and the tables, the present worth of $25,000.00 a year for twenty-two years is $301,050.00. From this sum the amount awarded to the family under the Wrongful Death Acts is to be deducted. This sum is $147,920.00. Deducting this figure from the $301,050.00 leaves $153,130.00 as the present worth of the pecuniary earnings lost to the state. To arrive at an award from this sum, it is necessary to deduct decedent's own maintenance expenses which he would have incurred had he lived. Under the cases and decisions these items, of course, include his cost of living, medical expenses, reasonable amounts for recrea-

tion, and general expenses of living. This is the area in the evidence in which there is very little proof, but it seems to this Court safe to conclude that his maintenance expenses are certainly equal to the amount he provided for his wife, that is, $10,000.00 a year. They both lived on the same scale. On this basis then, $120,420.00 is to be deducted from $153,130.00, leaving $32,710.00. This sum represents the loss of future earnings to the estate reduced to present worth. This sum also represents the diference between the likely gross earnings during decedent's lifetime diminished by the family contributions and less also the amount of his own maintenance during his life expectancy. To this sum is added the two years' gross earnings which are not to be reduced to present worth.

"In applying the doctrine of 'present worth,' it should be borne in mind that compensation, both for loss of earning power under the Survival Act and for loss of contributions under the Death Act, accruing from the date of the accident until the date of trial, is not reduced to present worth." See Pennsylvania Bar Association Quarterly, Vol. XXIII, No. 1, October 1951, p. 19.

The two years' gross earnings between the decedent's death and the trial amount to $50,000.00. But, however, during the two years preceding the trial decedent would have expended $20,000.00 on his own maintenance. Therefore, from his gross earnings that amount is to be deducted leaving the sum of $30,000.00 to be added to the $32,710.00, leaving a net recovery under the Survival Act of $62,710.00.

In summary then, the damages to be awarded the Executor are as follows:

Under the Wrongful Death Acts, ................. $149,920.00
Under the Survival Act .... 62,710.00

TOTAL DAMAGES: $212,630.00