In consequence, the Court will give judgment for defendants.

**Robert STEINBOCK–SINCLAIR, Plaintiff,**

v.

**AMOCO INTERNATIONAL OIL COMPANY, a Delaware Corporation, Defendant.**

**No. 71 C 2828.**

United States District Court,
N. D. Illinois, E. D.

Sept. 29, 1975.

Anna R. Lavin, Chicago, Ill., for plaintiff.

William D. Maddux and James E. Dahl of Kirkland & Ellis, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: JURISDICTION

PERRY, Senior District Judge.

This cause came on for trial on the issue of whether jurisdiction exists in this Court pursuant to the provisions of Title 28, U.S.C. Section 1332(c). The Court, sitting without a jury, having heard the evidence of the witnesses and having examined the documentary evidence submitted by both parties, and having heard the arguments of counsel, hereby makes the following findings of fact and conclusions of law:

### Findings of Fact

1. The plaintiff, Robert Steinbock-Sinclair, as of the time of filing this lawsuit, was a citizen and resident of the Northern District of Illinois.

2. The defendant, Amoco International Oil Company, is a corporation organized and existing under and pursuant to the laws of Delaware.

3. Defendant corporation is a wholly owned subsidiary of Standard Oil Company (Indiana) which finds, produces and transports crude oil and natural gas and manufactures and markets refined products outside North America.

4. Defendant's charter shows its business purpose to be the exploration for and production of crude oil and natural gas, the transportation, refining and marketing thereof and of refined oil products and provides for the necessary diverse powers and authorities to carry out this business purpose.

5. At near the time of filing the Complaint herein, defendant did no oil exploration, production, refining, marketing or any other of the activities defined in its charter as its business purpose in the State of Illinois or anywhere in the United States.

6. For the effectuation of the corporate purpose, numerous other corporations were set up in various parts of the world, including New York City, New York; Sydney, Australia; Hamilton, Bermuda; Cairo, Egypt; Tehran, Iran; Wembley and London, England; Dusseldorf, Germany; Milan, Italy; New Delhi and Madras, India; Buenos Aires, Argentina; Bogota, Colombia; as well as in other locations outside the United States. The offices of the foreign countries are known as the "foreign offices" of the defendant.

7. All of the establishments outside the United States were incorporated, some in Delaware and some in countries where the offices were located. (Testimony of Swiger and Vredenburgh). Some of these establishments were principally responsible for the production or exploration for crude oil, some for refining and marketing of refined products (testimony of Swiger and Vredenburgh); the trading for all or most of the foreign establishments and also ocean transportation activities were concentrated in Bermuda (testimony of Swiger and Pl. Ex. 5); Amoco Europe Inc., located in London, England, had management, supervisory and administrative functions over all facets of defendant's business in Europe. (Pl. Ex. 14, 20 and Def. Ex. 8)

8. The evidence discloses only one delivery of crude oil in the United States, and that in small quantities to a refinery in Yorktown, West Virginia (testimony of plaintiff), which delivery was handled through the office in Bermuda. (Pl. Ex. 5)

9. At the time of filing of this suit the defendant was not qualified to do business in the State of Illinois under the laws of Illinois, but made applica-

tion for such qualification promptly after being served with process in this suit (Pl. Ex. 3) and was so qualified by the State of Illinois in January 1972. (Pl. Ex. 3a)

10. In its application for qualification to the Secretary of the State of Illinois, after the date of filing of this suit, the defendant declared that its principal place of business was in the State of Delaware. (Pl. Ex. 3a)

11. The defendant's New York office had qualified to do buiness in and under the laws of the State of New York, paid taxes in that state and continued its qualification and payment of taxes to this date. (Pl. Ex. 22 and 23)

12. The defendant admitted (Def. Ex. 12) that its conglomerate corporations have grown rapidly, directed activities extending across the globe and in terms of employees and invested capital was the third largest individual company within Standard Oil Company (Indiana). Its Chicago office had only about 400 employees. (Pl. Ex. 10 and testimony of Denton)

13. All sales, billing, credit and collection matters were handled outside the United States (testimony of Vredenburgh). The Chicago office maintained certain statistical information. Funds received from sales were banked outside the United States (testimony of Vredenburgh). The Bermuda office had bank accounts in Nassau, Bahamas (testimony of Vredenburgh). Substantial funds were channeled through New York banks (approximately 400 million dollars annually) (testimony of Vredenburgh). Defendant's banking in Chicago, Illinois, was merely 2 million dollars annually (testimony of Vredenburgh) for the operation of the Chicago office.

14. Although personnel assigned to the Chicago office assisted in negotiating contracts for oil concessions, financing or product marketing, all such contracts were executed by and on behalf of the entities operating outside the United States and never by or for the establishment in Chicago, Illinois. (Testimony of Vredenburgh and Pl. Ex. 6)

15. The actual earnings from operations of the defendant corporation were 38.2 million dollars in 1970 and 86.6 million dollars in 1971. (Answer to Interrogatory No. 5)

16. The defendant reported for its income tax returns to the State of Illinois the following: 1970—$11,625,671.22 loss and 1971—$5,377,394.05 loss. (Answer to Request to Admit 6 and Pl. Ex. 9)

17. The defendant did not file any U. S. Federal Income Tax returns but is a member of the consolidated group included in the consolidated income tax return filed by Standard Oil Company (Indiana). None of Standard Oil Company's consolidated tax liability was allocated to the defendant for the years 1970 and 1971. (Answer to Interrogatory 7(c))

18. As of the end of 1971 there was close to 118 million dollars of earnings from the conglomerate corporations, which cash was held by defendant's trading and shipping offices in Bermuda and holding companies in Bermuda and Switzerland (testimony of Swiger, Tr. 183). None of these funds were held in a bank in Chicago, Illinois. (Testimony of Swiger, Tr. 183)

19. Defendant's operations were so structured that more of its establishments made losses than profits but the trading and shipping establishments located in Bermuda were profitable (testimony of Swiger and Vredenburgh); the operation in Australia was also profitable. Earnings of the Bermuda and Australian entities were accumulated abroad without any dividends being declared or paid to the United States. (Testimony of Vredenburgh)

20. Defendant paid in capital at the end of 1971 close to 500 million dollars (Pl. Ex. 3a). Funds on deposit in banks in Illinois were only 100,000 dollars and defendant's only other tangible assets in Illinois consisted of office furniture

in the Chicago office. The assets represented by crude oil production facilities, refineries, terminals, warehouses, tankers, retail stations and so on were wholly outside the State of Illinois (testimony of Denton and Vredenburgh).

21. There were 48 officers elected at the Special Meeting of Defendant's Board of Directors in 1971 (Def. Ex. 11). Of these, 30 resided outside the United States (testimony of Denton). In addition there were chairmen, managing directors, general managers, vice-presidents and other officers and high level functionaries of the Delaware-incorporated and of the foreign-incorporated establishments who, in all instances, resided · outside the United States (Pl. Ex. 16) and exercised management control of the operations.

22. Defendant's Board of Directors met in Chicago, Illinois, but the Board delegated its responsibilities to the President (testimony of Denton) who, in turn, delegated them to the Regional executives (Pl. Exs. 5, 14, 15, and 20). All day-to-day management and operating decisions were made in the regions abroad (testimony of Vredenburgh). Chicago office had only advisory functions and furnished technical expertise as and when requested by the foreign offices (testimony of Denton and Vredenburgh and Pl. Ex. 20). While operations in Europe were directed from London, England (Pl. Exs. 14 and 20), those in Egypt were conducted by GUPCO, an Egyptian-incorporated company managed from Cairo, Egypt (Pl. Ex. 11 and testimony of Vredenburgh) while those in Iran were directed and managed by IPAC, an Iranian corporation in Tehran, Iran. (Testimony of Vredenburgh)

23. The defendant was inconsistent in its testimony as to the place of greatest crude oil production. Its witness Denton sought to assert that it was Argentina; Vredenburgh stated that it was either Iran or Egypt. Defendant's consolidated control budget (Pl. Ex. 7 and 7a) shows the greatest volume of production of crude oil to be in Egypt.

24. The defendant had an oil refinery and product marketing facilities in Australia, but overwhelmingly the greatest volume of processing of crude oil into refined products and of marketing of refined products to the public was in Europe (England, Germany and Italy) (Pl. Exs. 7 and 7a). All the European refining and marketing operations as well as crude oil and natural gas exploration and production operations (England, Norway, Holland) were directed and administered by Amoco Europe, Inc., situated in London, England (Pl. Exs. 14 and 20 and Def. Ex. 8). The President and all officers of Amoco Europe, Inc., resided and had their offices in England.

25. The defendant contended that its nerve center was in Chicago, Illinois, by virtue of the facts that records were kept there, the Board of Directors met there, most of the officers have been residents of Illinois, income tax returns were prepared in Chicago; over 400 employees worked in Chicago and the exploration, production, refining and marketing facilities were scattered throughout the world. These contentions are inaccurate and the proofs in open court showed that only records of inactive operations are kept in archives in Chicago while all records of active operations were abroad (Denton); the Board of Directors had only limited authorities having delegated its powers except for the Control Budget to the President, who, in turn delegated them to the territorial or regional executives (testimony of Denton and Pl. Exs. 5, 11, 14, 15 and 20); of the 48 officers elected by the Board of Directors (Def. Ex. 11) 30 resided abroad (Denton); only the Illinois State income tax returns were prepared and filed by the Chicago office (Swiger) as against income tax returns prepared and filed in more than 20 foreign countries; the number of persons employed in the Chicago office was but a small fraction of the vast organization (Def. Ex. 12 and Pl. Ex. 10); oil production was heavily concentrated in Egypt, Iran and

**24**

Argentina; with Egypt being the largest (Vredenburgh and Pl. Ex. 7 and 7a), and the office of Amoco Europe, Inc., in London, England, directed and controlled all exploration, production, refining and marketing activities throughout Europe.

*Conclusions of Law*

1. The plaintiff is an individual and at the time of filing of this action was a domiciliary and citizen of the State of Illinois.

2. The defendant is a corporate conglomerate incorporated by and under the laws of the State of Delaware and of certain foreign states.

■ 3. In an action between an individual and a corporation where jurisdiction of the court is invoked under diversity of citizenship provisions of Title 28, U.S.C. Section 1332(c), a corporation is deemed to be a citizen of the state by which it has been incorporated and of the state where it has its principal place of business.

■ 4. Promptly upon being served with process in this suit the defendant made application to the Secretary of the State of Illinois seeking to qualify to do business in the State of Illinois, and in the said application the defendant averred that its principal place of business was located in the State of Delaware. (Pl. Ex. 3a) By this admission a prima facie case in support of jurisdiction of this Court has been established and the burden of the evidence fell on the defendant. *In re Hudson River Nav. Corp.*, 59 F.2d 971, 973 (2nd Cir. 1932), citing also other cases.

5. The defendant never assumed the burden to off-set and disprove its formal averment that the principal place of business was in the State of Delaware.

6. By its Charter the defendant is authorized, and the evidence showed that the defendant is so engaged in the exploration for and production of crude oil and natural gas, transportation, refining and marketing of the crude substances and of a variety of products manufac-

tured or derived therefrom. All of these operations were conducted outside the United States except for deliveries of small amounts of crude oil to a refinery in Yorktown, West Virginia, pursuant to arrangements made by defendant's office in Bermuda. The defendant is a large multi-national conglomerate but does not pursue any of its chartered business purposes and objectives in the State of Illinois.

■ 7. The defendant argued that in the case of a multi-national corporation its operations outside the United States should be disregarded. Such a construction of the statute was rejected in *Eisenberg v. Commercial Union Assurance Company*, 189 F.Supp. 500 (S.D. N.Y.1960), and if defendant's own suggested authority were followed the Court should find the principal place of business of the defendant to be in the State of Delaware. J. Moore, *Federal Practice* ¶ 0.77 [2.–3], at 717.47.

■■ 8. Determination of a corporation's principal place of business is made on a case by case basis and requires a review of corporation's total activity taking into consideration such factors as the character of the corporation, its purposes, the kind of business in which it is engaged and the situs of its operations including a comparison of the character, importance and scope of the activities conducted in each state where the corporation operates. *Gilardi v. Atchison, Topeka & Santa Fe RR.*, 189 F.Supp. 82 (N.D.Ill.1960); *Scot Typewriter Co. v. Underwood Corp.*, 170 F. Supp. 862 (S.D.N.Y.1959); *Moesser v. Crucible Steel Co.*, 173 F.Supp. 953 (W.D. Pa.1959). In reviewing the principal factors considered in case law the paramount consideration is where the principal day-to-day business operations and activities of the corporation are formulated and carried out, *Huggins v. Winn-Dixie Greenville, Inc.*, 233 F.Supp. 667 (E.D.S.C.1964), and its dealing with the public and its customers, *Dryden v. Ranger Refining and Pipe Line Co.*, 280 F. 257 (5th Cir. 1922).

9. Defendant's offices in New York and Chicago cannot be separated from its operations abroad. The offices in New York and Chicago if taken together but without the operations outside the United States do not perform defendant's business purposes. Consideration is required of the totality of defendant's activities to meet its corporate purpose and objectives, *Moesser v. Crucible Steel Co., supra, Dryden v. Ranger Ref. & Pipe Line Co., supra, Epstein v. Guilford Industries, Inc.,* 218 F.Supp. 286 (S.D. N.Y.1963); and such consideration is no innovation, *Textron Electronics Inc. v. Unholtz-Dickie Corp.,* 193 F.Supp. 456 (D.C.Conn.1961). It is also supported by defendant's own practice reflected in movement of personnel between its many offices, funneling of its trading and shipping activities through its Bermuda offices regardless of the origin of the crude oil or its destination, and by the consolidation and review of defendant's operations through a Consolidated Control Budget (Pl. Ex. 7 and 7a).

10. Defendant's only tangible assets in the State of Illinois consisted of office furniture for its employees in the Chicago office, and of a small amount of money on deposit in a Chicago bank. The defendant also owned office furniture and had considerably greater funds on deposit in banks in the City of New York. The significant, and very substantial, tangible assets, in oil exploration equipment, oil production installations, oil refineries, ocean tankers, marketing outlets, warehouses as well as office furniture and funds in banks, owned by the defendant, were located outside the United States. If the assets test alone were determinative of the issue before the Court, the defendant cannot be deemed to have its principal place of business in the State of Illinois.

11. Egypt was defendant's most important center of production of crude oil. Production of this oil was managed and directed from Cairo, Egypt (Pl. Ex. 11). The crude oil was also loaded into ocean tankers and billing was effected by the same organization.

12. The character and scope of the office of Amoco Europe, Inc., located in London, England, places the most significant contacts with the public and defendant's customers in that location.

13. Defendant's contention that Chicago, Illinois, constituted the nerve center of its operations was inadequately supported to meet the test under *Kelly v. United States Steel Corporation,* 284 F.2d 850 (3rd Cir. 1960) and *Sabo v. Standard Oil Company of Indiana,* 295 F.2d 893 (7th Cir. 1961).

14. The argument of defendant's counsel that the statistical services performed by the Chicago office aided in investment decisions is unsupported by proofs and, in and of itself, cannot determine the defendant's principal place of business. Defendant did not offer any authorities to support its theory and the court has found none.

15. New York appears to have played a significant role in defendant's financial operations while the banks in Chicago merely supplied the needs of the office in that city. The defendant had qualified to do business in the State of New York and paid taxes there continually from the earliest date of its existence to this date. The defendant did not even seek to qualify to do business under laws of Illinois until it was served with process in this suit. Under the facts and under *Lurie v. Loew's San Francisco Hotel Corp.,* 315 F.Supp. 405 (N.D.Cal. 1970), the defendant cannot be deemed to have its principal place of business in Illinois.

16. Defendant's proposition that the principal place of business of Standard Oil Company (Indiana) be deemed to be also its principal place of business must be rejected. The only link between the defendant and Standard Oil Company was shown to lie in funds received from the latter by way of contributions to capital and loans, and that the defendant availed itself of the provisions of the Internal Revenue Code allowing consolidation of earnings and losses between a principal stockholder and its operating subsidiaries. No proof was adduced that

the stockholder directed or even influenced management decisions and defendant's own witness testified that decisions whether or not to remit dividends were made outside the United States. There is no legal precedent for the proposition that a passive stockholder determines the principal place of business of the corporation in which it owns an interest, however large such an interest may be.

 17. The proof points to three significant centers of operating management: London, England; Bermuda, and Cairo, Egypt. The London office performs multi-functional (exploration, production, refining and marketing) responsibilities and directs operations in many countries throughout Europe. The centers of crude oil production, e. g. Egypt, and the trading and ocean transportation activities in Bermuda support and furnish the requirements of the refining and marketing operations which provide the most significant contacts with the public and constitute the ultimate objective and purpose of the defendant's business. On this basis the Court would be justified in holding that the office of Amoco Europe, Inc., located in London, England, was the principal place of business of the defendant.

18. Plaintiff need not establish, nor is it necessary for the Court to decide, where the principal place of business of the defendant is actually situated. The jurisdictional issue in this lawsuit can be resolved by a determination whether or not the defendant has its principal place of business in Illinois. *United Nuclear Corp. v. Moki Oil & Rare Metals Co.*, 364 F.2d 568 (10th Cir. 1966) *certiorari denied* 385 U.S. 960, 87 S.Ct. 393, 17 L.Ed.2d 306 (1966); *Unger v. Del E. Webb Corporation*, 233 F. Supp. 713 (N.D.Cal.1964); *First Nat. Bank of Meadville, Pa. v. Niagara Therapy Mfg. Corp.*, 229 F.Supp. 460 (W.D. Pa.1964); and *Textron Electronics, Inc. v. Unholtz-Dickie Corp., supra.*

19. Plaintiff's plea that diversity of citizenship exists between him and the defendant under Title 28, U.S.C. § 1332 (c) is well taken.

20. This Court has jurisdiction of the parties and subject matter of this lawsuit pursuant to the provisions of Title 28, U.S.C. § 1332(c).

The court is entering simultaneously herewith a judgment order in accordance with its foregoing findings of fact and conclusions of law; and pursuant to 28 U.S.C. § 1292(b) in said order states that its interlocutory order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.