Skoda *v.* West Penn Power Company, Appellant.

324

Argued September 28, 1962.   Before BELL, C. J.,
MUSMANNO, JONES, EAGEN and O'BRIEN, JJ.

reargu-
ment refused July 5, 1963.

*Robert W. Smith, Jr.,* with him *George Y. Meyer,*
and *Smith, Best & Horn,* and *Meyer, Darragh, Buckler
& Bebenek,* for appellant.

*Ned J. Nakles,* with him *Louis C. Glasso, Thomas
A. Livingston,* and *Lightcap, McDonald & Moore,* for
appellee.

OPINION BY MR. JUSTICE O'BRIEN, June 4, 1963:

This is an appeal by West Penn Power Company,
a corporation, from a judgment entered against it and
National Mines Corporation on a verdict of a jury, in
a survival action by appellee, as administratrix of her
deceased husband's estate.

Frank B. Skoda, Jr., employed by National Mines
Corporation as a mechanic, was injured while at work
on June 24, 1957, and died on August 17, 1957, as a
result of the injuries. The West Penn Power Company
supplied electricity to the National Mines Corporation
at its plant in Luzerne Township, Fayette County.

Wrongful death and survival actions were insti-
tuted by Virginia Skoda, widow of the deceased, in her
capacity as administratrix of her husband's estate. The
wrongful death action was nonsuited as it was barred
by the statute of limitations and a verdict in the sur-

vival action was returned in the amount of $152,213. We are only concerned with the judgment in the survival action, as it is agreed the wrongful death action is barred by the statute of limitations. The National Mines Corporation was joined as additional defendant by the West Penn Power Company and the verdict is against both defendants. The West Penn Power Company filed motions for a new trial and for judgment n.o.v. The National Mines Corporation did not file any motions or join in this appeal.

Appellant, in its contention for judgment n.o.v., maintains that: (1) there is not sufficient evidence to submit to the jury the issue of negligence of West Penn Power Company, either as the sole legal cause of the accident, or as the concurrent cause with the negligence of National Mines Corporation; and (2) the decedent was, as a matter of law, contributorily negligent. In its motion for new trial, West Penn says the verdict was so shockingly disproportionate to the injuries of decedent as to be excessive.

In considering judgment n.o.v., the evidence, together with all reasonable inferences therefrom, are considered in the light most favorable to the verdict winner. *Ischo v. Bailey,* 403 Pa. 281, 169 A. 2d 38 (1961); *Matkevich v. Robertson,* 403 Pa. 200, 169 A. 2d 91 (1961); *Muroski v. Hnath,* 392 Pa. 233, 139 A. 2d 902 (1958).

The evidence, so considered, shows that Frank B. Skoda, Jr., at the time of his death was 35 years old, he was employed by the National Mines Corporation as a mechanic for about ten years. His place of employment was in and about the garage building, repair shop and other buildings of National Mines in Luzerne Township, Fayette County. On June 24, 1957, the day of the accident, he was engaged with another employee in repairing a fuel tank on a 22 ton Euclid dump truck, which was used exclusively on the premises of National

Mines for the purpose of hauling mine refuse from the mine opening to the slate dump. It was necessary to remove the fuel tank from the body of the truck and in order to do so the truck body was elevated hydraulically and then a timber was wedged under the body to prevent it from falling while the tank was removed. The truck was placed over an underground fuel tank, near the entrance to the mine garage, to drain the fuel from the truck before removing it for the repairs. It became necessary to move the truck in order for other trucks to have access to the underground fuel tank.

The work of removing the fuel tank, welding and painting it was done in the morning, and in the afternoon, in moving the truck without the fuel tank, Skoda walked along beside the truck carrying a gallon fuel can in which was placed a line feeding to the engine of the truck. Robert Pierno, a fellow employee, slowly drove the truck in reverse while watching Skoda's feet. The truck was moving backwards with the body in the upright position, Pierno watching Skoda's feet, when the topmost part of the body, known as the truck cab protector, came in contact with a high tension wire. Pierno heard a hissing sound and stopped the truck and, alighting, saw decedent on the ground enveloped in fire. The fire was extinguished with the help of other employees and Skoda was taken to the hospital where he died as a result of the burns on August 17, 1957.

The wire touched by the truck was one of three parallel wires which carried 25,000 volts of electricity. The electrical lines of the appellant supplied the electricity to National Mines, which lines were carried by means of poles to a transformer station, which was a brick structure with an enclosed area in which were poles and transformers. The wires were between 20 and 21 feet from the ground, copper and uninsulated. The top of the dump truck, with the bed extended at the time of the accident, was 20 to 21 feet from the

ground. The truck bed extended approximately 3 to 5 inches above the wire at the point of contact. The truck stopped with the bed between the first and second wire, contact having been made with the first wire. The vehicle was equipped with large rubber tires. The truck was backed approximately 93 feet from where it was at the garage to the point of contact with the electrical wire. The poles supporting the wires to the transformer yard had a span of approximately 154 feet. There would be a normal sag in the line which would vary somewhat with the temperature.

National Mines had five trucks that were used and serviced in this area. They were greased and washed once a week. The lubrication of the trucks generally took place in the garage and outside the doors on an apron which extended about 55 feet from the garage door towards the transformer station. The trucks were washed at a place nearer the transformer station and closer to the overhead electric wires and the trucks were sometimes parked in the vicinity of the transformer yard and had sometimes been parked under the wires with the bodies in a flat position. The area in which the trucks were lubricated, which operation required the extension of the bodies, was approximately 60 feet from the high tension wires, and the area in which the trucks were washed, also with the bodies extended, was nearer to the wires.

It is a well recognized statement of the law that a supplier of electricity must exercise the highest degree of care, however, it is not an insurer against injury. While the supplier of electricity is under the duty of a high degree of care there is likewise imposed upon those who are aware of and work in the vicinity of electrical high tension wires a duty to exercise reasonable care to avoid injury to themselves and others. *Stark v. Lehigh Foundries, Inc.*, 388 Pa. 1, 130 A. 2d 123 (1957) ; *Brillhart v. Edison Light & Power Co.*, 368

Pa. 307, 82 A. 2d 44 (1951); *Durinzi v. West Penn Power Co.*, 357 Pa. 576, 55 A. 2d 316 (1947); *Reed v. Duquesne Light Co.*, 354 Pa. 325, 47 A. 2d 136 (1946).

The high tension wires were between 20 and 21 feet above the ground. The wires had been erected and maintained in this condition for many years previous to the death of the decedent. The employees of National Mines engaged in work in the immediate vicinity of the transformer knew of the existence and danger of the wires. The record indicates that the men discussed the danger of this situation. The transformers were in the area of a cluster of buildings in which were carried on the various activities of National Mines in maintenance incidental to the operation of mining by National Mines. The buildings consisted of blacksmith shop, garage and paint shop. The maintenance work on the trucks was conducted at a distance of 60 feet and less from the high tension wires. The work on the trucks required the bodies to be raised in servicing and washing them. The evidence indicates that the large trucks with their bodies extended were between 20 and 21 feet above the ground. There is evidence in the record that the trucks had been parked with the bodies flat under these high tension wires, but the practice had been discontinued about a year previous to the death of the decedent.

There is no statutory requirement regulating the minimum height of the high tension wires. In *Brillhart v. Edison Light & Power Co.*, supra, this Court said: "Although a minimum clearance for high voltage wires strung over buildings and land has not been statutorily prescribed, the common usage in the business is a fair test or standard of care: Maize v. Atlantic Refining Company, 352 Pa. 51, 57, 41 A. 2d 850. As stated in Koelsch v. The Philadelphia Company, 152 Pa. 355, 362, 25 A. 522,—'While no absolute standard of duty in dealing with such agencies can be prescribed,

it is safe to say in general terms that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken.' "

There was evidence of the Federal Mine's Safety Code prescribing a minimum of 20 feet clearance height for wires of this type. However, this code did not apply to the electrical industry. There was evidence of the appellant's minimum wire clearance specifications which indicated the minimum clearance to the ground in this type of wires should be 22 feet. The record herein indicates sufficient evidence for the jury to consider negligence of appellant. *Stark v. Lehigh Foundries, Inc.,* supra.

Appellant maintained that even if it was in some manner negligent in the installation and maintaining of its power lines, that negligence was quiescent, and but for the independent negligent act of the driver, Robert Pierno, in backing the truck in a diagonal course, where he was unable to see the power lines, although he knew they were there, the accident would not have occurred.

The general rule is stated in the Restatement, Torts, §447: "The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if (a) the actor at the time of his negligent conduct should have realized that a third person might so act, . . ." In *Roadman v. Bellone,* 379 Pa. 483, 108 A. 2d 754 (1954), page 492, we said: "It is true that an intervening negligent act is not always a superseding cause which relieves an antecedent wrongdoer from liability for negligently creating a dangerous condition which results in injury: Restatement, Torts, §447. This section has been cited with approval in Darrah v. Wilkinsburg Borough, 318 Pa. 511, 178 A. 669; Murray v. Pitts-

burgh Athletic Co., 324 Pa. 486, 188 A. 190; Kline v. Moyer, 325 Pa. 357, 191 A. 43; Nelson v. Duquesne Light Co., 338 Pa. 38, 12 A. 2d 299; Mautino v. Piercedale Supply Co., 338 Pa. 435, 13 A. 2d 51; Brogan v. Philadelphia, 346 Pa. 208, 29 A. 2d 671; Styer v. Reading, 360 Pa. 212, 61 A. 2d 382; Malitovsky v. Harshaw Chemical Co., 360 Pa. 279, 61 A. 2d 846; St. John v. Kepler, 360 Pa. 528, 61 A. 2d 875; and Levine v. Mervis, 373 Pa. 99, 95 A. 2d 368. These cases have greatly modified the decision in Stone v. Philadelphia, 302 Pa. 340, 152 A. 550, that an intervening negligent act operates as a superseding cause and insulates an antecedent tortfeasor from liability.

"However, some intervening negligent acts which operate upon a condition created by an antecedent tortfeasor do constitute superseding causes and relieve him of liability. In determining whether an intervening force is a superseding cause we said in Hendricks v. Pyramid Motor Freight Corp., 328 Pa. 570, 574, 195 A. 907, 909: 'The answer to this inquiry depends on whether the [intervening] conduct was so extraordinary as not to have been reasonably foreseeable or whether it was reasonably to be anticipated.' The Restatement, Torts §435(2), (1948 Supplement, p. 736) says: 'The actor's conduct is not a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.' Cf. Restatement, Torts, Penna. Annotations, §442."

Also in the *Stark* case, supra, page 11: " ' " 'One who negligently creates a dangerous condition cannot escape liability for the natural and probable consequences thereof, although the innocent act of a third party may have contributed to the final result.' And when there are two contributing acts, it is not proximity in time that determines which of them is the proxi-

mate cause of the resulting injury :" Mars v. Meadville Telephone Co., 344 Pa. 29, 31. An intervening negligent act is not always a superseding cause which relieves an antecedent wrongdoer from liability for negligently creating a dangerous condition which results in injury. Restatement, Torts, sec. 447.' "

The record in this case clearly indicates that the action of the trial judge, in submitting the question of superseding cause to the jury for its determination, was entirely proper. Of course, if the facts indicating a superseding cause are so clear as to become a matter of law, it is the duty of the trial court so to determine the matter. *Kline v. Moyer,* 325 Pa. 357, 191 A. 43 (1937) ; *Hajduk v. Fague,* 200 Pa. Superior Ct. 55, 186 A. 2d 869 (1962). That, however, is not the situation presented by this record. *Malitovsky v. Harshaw Chemical Co.,* 360 Pa. 279, 61 A. 2d 846 (1948) ; *St. John v. Kepler,* 360 Pa. 528, 61 A. 2d 875 (1948).

There is evidence in the record that the decedent was aware of the high tension lines and their danger and the necessity to avoid contact with them. The area in which decedent was engaged in his work was in the vicinity of and at times under the lines. It is quite normal and likely that, at times, the decedent, as other men working in the area, could conceivably become so engrossed in his work, particularly on trucks of the size and type here involved, as to make him temporarily oblivious to any other surrounding danger than the trucks he was working on. The decedent is presumed to have exercised due care for his safety, and a finding as a matter of law that he was contributorily negligent requires evidence so clear, direct and positive as to preclude any difference in the minds of fair and reasonable men with regard to it. *Scholl v. Philadelphia Suburban Transportation Co.,* 356 Pa. 217, 51 A. 2d 732 (1947).

It is only in clear cases and where there is no room for fair and reasonable disagreement as to the existence of contributory negligence that the court will declare it to exist. In *Cooper v. Heintz Manufacturing Co.,* 385 Pa. 296, 122 A. 2d 699 (1956), we said (p. 306): "We have stated repeatedly that the Court 'can declare as a matter of law that a certain state of facts amounts to contributory negligence on the part of a plaintiff only in cases so clear that there is no room for fair and sensible men to differ on their conclusions from the available data.' " *Topelski v. Universal South Side Autos, Inc.,* 407 Pa. 339, 180 A. 2d 414 (1962) ; *Weidemoyer v. Swartz,* 407 Pa. 282, 180 A. 2d 19 (1962).

The court en banc properly refused appellant's motion for judgment n.o.v.

Appellant's motion for new trial, on the ground that the verdict in the amount of $152,213 is excessive, was refused by the court en banc and the refusal to grant the motion is assigned as error.

Suit was instituted both under "wrongful death action" (12 P.S. §§1602-1604) and "survival action" (20 P.S. §320.603). The complaint, however, was not filed for more than a year following the date of death and the trial judge properly granted the defendants' motion for nonsuit as to the "wrongful death action." The jury had for its consideration the "survival action" only. The trial judge, in the course of his charge, said: "The amount representing the present worth of Mr. Skoda's future loss of earnings, less the probable cost of future personal maintenance, to that amount you would then add the amount that he would have earned from the date of the injury or death to the date of trial. *In other words, they would be entitled to recover the full amount of his earnings from the time of the injury until the date of trial, without reduction of present worth . . .*" (Emphasis supplied)

And further, inter alia, in the charge, on a point submitted by defendant: "BY THE COURT: They are all refused except the sixth point, which is as follows: 6. Since you are concerned only (I am reading this to you because it will summarize the measure of damages), since you are concerned only in this case with the so-called 'survival action,' the proper measure of damages, therefore if you find in favor of the plaintiff administratrix, would be the present worth of Skoda's likely earnings during the period of his life expectancy, and that sum must be reduced by the amount of the provision he would have made for his wife and children for their support during the period of his life expectancy and while the family relationship continued between them, and reduced also by the probable cost of his own maintenance during the time he would likely have lived but for the accident. No allowance can be made for any mental suffering, grief, or loss of companionship sustained by his family.

"BY THE COURT: *That point is affirmed with this qualification that you calculate his earnings from the time of the accident to this time, today, and you only reduce his future earnings from today on to present worth and deduct those other items, the cost of his maintenance and his* family and so on." (Emphasis supplied)

In *Ferne v. Chadderton*, 363 Pa. 191, 69 A. 2d 104 (1949), we said (pp. 197, 198): *"Under the Death Statutes* the administratrix was entitled to recover for the benefit of the daughter and herself as widow the amount of the pecuniary loss they suffered by reason of decedent's death, that is to say, the present worth of the amount they probably would have received from his earnings for their support during the period of his life expectancy and while the family relationship continued between them, but without any allowance for mental suffering, grief, or loss of companionship; in

other words, the measure of damages is the value of the decedent's life to the parties specified in the statute: Minkin v. Minkin, 336 Pa. 49, 55, 7 A. 2d 461, 464. Recovery is also allowed for the expense incurred for medical and surgical care, for nursing of the deceased, and for the reasonable funeral expenses: Act of May 13, 1927, P. L. 992. *Under the Survival Statute* the administratrix was entitled to recover for the loss of decedent's earnings *from the time of the accident until the date of his death,* and compensation for his pain and suffering during that period. Recovery may also be had for the present worth of his likely earnings during the period of his life expectancy, but diminished by the amount of the provision he would have made for his wife and children as above stated (thus avoiding duplication: Pezzuli, Administrator v. D'Ambrosia, 344 Pa. 643, 650, 26 A. 2d 659, 662) and diminished also by the probable cost of his own maintenance during the time he would likely have lived but for the accident: Murray, Administrator v. Philadelphia Transportation Co., 359 Pa. 69, 73, 74, 58 A. 2d 323, 325." (Emphasis supplied)

The trial judge, in his instructions to the jury on damages, stated the measure of damages which the plaintiff, as representative of decedent's estate, would be entitled to receive as follows: "In other words, *they* would be entitled to recover the full amount of his earnings from the time of the injury until the date of trial, without reduction of present worth." (Emphasis supplied) This was not proper instruction in this survival action. The amount of decedent's earnings from the time of injury until the trial should be reduced by the amount he would have contributed to his family. The decedent contributed for the family's support $4,-920 annually and approximately four years elapsed from the time he was injured until trial. This would amount to $19,680 which the jury undoubtedly award-

ed under the instructions by the court. This instruction was not cured in the affirmance of defendants' sixth point for charge with the qualification "that you calculate his earnings from the time of the accident to this time, today, and you only reduce his future earnings from today on to present worth and deduct those other items, the cost of his maintenance and his family and so on." The trial judge instructed the jury to include the funeral bill in the amount of $976.85. This was not a proper item of damage in this action.

Appellant questions the correctness of the court's charge on the items of damages the administratrix of the decedent's estate would be entitled to from the time of the accident until the date of trial. This is a correct statement of the law although the *Ferne* case, supra, page 197, does say ". . . the administratrix was entitled to recover for the loss of decedent's earnings *from the time of the accident until the date of his death. . . .*" (Emphasis supplied) The administratrix is entitled to recover for the loss of the decedent's earning power from the time of the accident until the time of trial and of course compensation for decedent's pain and suffering from the time of the accident until the date of his death.

While the administratrix may not recover the item of funeral bill in a survival action, since there is no statutory authorization for it, there may be a recovery in a survival action for medical services, nursing and hospital care, since that is provided for by the Act of 1949, P. L. 512, §601, since he could in his lifetime bring an action for these items. The right survives the death of the decedent and may be asserted by his representative as though decedent were alive. Obviously he could not bring an action for his funeral bill in his lifetime and, therefore, his personal representative, prosecuting an action that he could have maintained in his lifetime, is barred. In *Radobersky v. Imperial*

*Volunteer Fire Department,* 368 Pa. 235, 81 A. 2d 865 (1951), we said (p. 243) : "Obviously, the expenses for his own funeral do not fall into the category of the damages allowable to him personally."

Decedent was taken to the hospital where he lived for 55 days. He had third degree burns over 65 percent of his body which were described by an attending physician as burns which go through the entire thickness of the skin, plus some of the structure beneath it. Third degree burn is practically cooked. Decedent was in shock because of the loss of plasma portions of the blood and during the first 24 hours in the hospital he was administered approximately 10 quarts of fluid to replace his blood fluid, which was lost. The doctor in describing his injury said: "Well, with extensive damage to the skin it blanched it. It became white and hard. With just looking at burned skin, it has lost its color. We know that the blood supply of that skin has been damaged or ruined. The skin is hard to touch. He was in bad shape. Sixty-five per cent (65%) of him was that way."

The doctor further testified: "I don't have the descriptive terms available" to describe his condition. The doctor said it was one of the worst cases he had ever seen and it was the doctor's opinion that: "I don't think he was without pain from the time he went in until he died," although morphine was administered several times a day in order to somewhat relieve the pain. The burned skin broke down and became soft and mushy and two skin grafts were attempted. The burns were so extensive that a general anesthetic had to be administered to the decedent to dress the burns and after the burns were first dressed under the general anesthetic decedent's condition was so bad the doctor could not touch him for the first nine days. He lived for 55 days in a condition of excruciating pain. He was placed under a general anesthetic seven times

for five dressings of the burns over his body, and two skin grafts.

Appellate courts are properly reluctant to interfere with jury verdicts in personal injury cases, which verdicts are supported by the opinion and approval of the trial judge and the court en banc. *Roadman v. Bellone,* supra. The granting or refusal of a new trial because of excessiveness is peculiarly within the discretion of the court below and we will not interfere, absent a clear abuse of discretion. *Hall v. George,* 403 Pa. 563, 170 A. 2d 367 (1961). We will not hold that a verdict is excessive unless it is " 'so grossly excessive as to shock our sense of justice.' " *Kane v. Scranton Transit Co.,* 372 Pa. 496, 94 A. 2d 560 (1953), and cases cited therein. In view of the agony endured by the decedent for 55 days, we cannot say that our sense of justice is shocked. The jury, in all probability, made a large award for pain and suffering and we will not substitute our judgment for that of the jury in determining the monetary value of the torture suffered by decedent between the accident and his death.

As we have pointed out, however, the trial court erred in its instructions to the jury in the matter of decedent's lost earnings to trial and the funeral bill. The verdict should be reduced by the amounts representing these erroneous instructions, to wit: $19,680 and $976.85, or a total of $20,656.85, thus avoiding the necessity of a new trial. *Radobersky v. Imperial Volunteer Fire Department,* supra.

The judgment is reduced by the sum of $20,656.85 and, as so reduced, is affirmed.

Mr. Chief Justice BELL and Mr. Justice BENJAMIN R. JONES dissent and would enter judgment n.o.v. for West Penn Power Co.