764

## Yocum v. Honold

*William C. Archbold* and *Joseph McFadden*, for plaintiffs.

*John F. Cramp* and *Joseph W. Kauffman*, for defendants owner and tenant.

*James C. Brennan*, for defendant utility.

JEROME, *J.*, January 3, 1975—Plaintiffs instituted this action in trespass to recover damages for

injuries sustained by a 12-year-old boy when he came in contact with an electric line which was suspended over the roof of a machinery shed on property owned by defendant, Ludwig Honold Properties, Inc. The incident occurred on September 3, 1964, and was tried before this court and a jury in September of 1973. The jury returned a verdict in favor of plaintiffs against the Philadelphia Electric Company alone in the sum of $150,000. Timely motions for judgment n.o.v. and/or a new trial were filed by defendant, Philadelphia Electric Company, which are presently before the court.

It is well established that in considering a motion for judgment n.o.v., the evidence, together with all reasonable inferences therefrom, must be viewed in a light most favorable to the verdict winner. See Herron v. Silbaugh, 436 Pa. 339, 260 A. 2d 755 (1970). In the case before us, a review of the evidence as submitted by plaintiff indicates the following:

1. The installation of the electric line took place in 1947 and ran from a transformer owned by the Philadelphia Electric Company over the machine shed to the inner portions of the farm in question. The electric company participated in the actual designing and planning of the new electric service for the farm. They even recommended to the then owner of the farm a particular electrical contractor who did the work.

2. There was no change in the location of the wires themselves or the poles or the transformer or the relative height of the wires other than the changes due to normal temperature variation throughout the entire period from 1947, when the

original installation took place, until the date of the accident.

3. Under the National Electric Code an energized line or a neutral is prohibited from being within eight feet of the peak or crest of a roof. The reason for this was to prevent "reaching" of the energized line by persons who might come on to the building, such as the minor plaintiff. The wire was not eight feet above said building at the time of its original installation in 1947, when Philadelphia Electric Company admitted that it inspected the premises, nor at any time thereafter up to the time of the minor defendant's injury in September of 1964.

4. An engineer testified that the installation was an unsafe installation from the outset because of the violation of the eight-feet rule.

5. Philadelphia Electric Company actually inspected the wires over the machinery shed in 1947 prior to energizing the line. At this time, the lineman who performed the inspection used the sketch which had been previously prepared by Philadelphia Electric personnel for the placement of the lines.

6. Philadelphia Electric, through their agent, admitted that defendant Honold did not have any control over the flow of electrical current through the wires up to the point that they reached the transformer and, hence, could not stop the 2,400 volts of electricity that ultimately injured plaintiff. Further, Honold did not even have the control to stop the flow of the 110-volt current that went from the transformer into his meter and service.

7. The owner of the farm at the time of the installation testified that Philadelphia Electric picked the location of the transformer pole and the location

of the meter and inspected the job after its installation and advised him with regard to the capacity of the system once it was installed. The evidence indicated that there were at least quarterly visits to the premises from 1947 up until the time of the accident by representatives of the Philadelphia Electric Company. In April of 1963, a lineman from the electric company went to the premises to change the meter, and later the same year a lineman again visited the premises to actually physically remove a meter. These activities were described as requiring a full inspection either by a company employe or an underwriting agency.

8. Linemen and trouble men and crews from the Philadelphia Electric Company are trained to report dangerous conditions and have a form for this purpose. No such dangerous condition concerning the low placing of the wires over the machinery shed was ever reported.

9. The original design for the new electric service prepared by the Philadelphia Electric Company representatives requires that the 2,400-volt line pass over open ground between the garage and the machinery shed in order to avoid the very problem which caused the accident here, namely contact by reaching. An engineer from the electric company acknowledged that the deviation from the specifications which resulted in having the wire go over the machinery shed produced additional responsibility on the part of the lineman crew to be certain that there is no reaching problem. This shift in the location of the wires required the lineman to check the clearances. The engineer for the electric company testified that, in making these measurements, however, probably all that was done was for the lineman to perch 77 feet away and just guess

whether or not the wires complied with the eight-feet rule.

It is well recognized that a supplier of electricity, although not an insurer against injury, must exercise the highest degree of care to avoid injury to anyone who may come in contact with its wires. See Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 120 A. 2d 123 (1957); Dunnaway v. Duquesne Light Co., 423 F. 2d 66 (3rd Cir., 1970).

While there is no statutory requirement regulating the minimum height of wires, the standards set forth in the National Electric Code which standards were acknowledged by the electric company form the reasonable standard of care. In view of the standard and its violation by the electric company as outlined above, the jury was warranted in their finding of negligence. See Skoda v. West Penn Power Company, 411 Pa. 323, 191 A. 2d 822 (1963). Moreover, the major role of the electric company in designing and planning of the electric service and its inspection of the site both before and after it energized the line supports such a finding.

Defendant raises several arguments in support of its motion for a new trial. The first concerns itself with the charge given with respect to the notice of the defective condition on the part of the electric company. Defendant does not object to the law stated in the charge, but argues that there were no facts on which the jury could find actual notice or actual knowledge on the part of the electric company of the defective condition and, therefore, the giving of the charge itself was in error.

A review of the charge in its entirety indicates no basis for defendant's position. Further, from the facts as presented, some of which have been previ-

ously enumerated in this opinion, it was left to the jury whether they found actual notice of the defects on the part of the electric company. There was ample evidence for the jury to so find.

Defendant also objects to the court's charge with regard to defendant, Honold, individually and corporately. (It may be noted that a joint tortfeasor's release between plaintiffs and these defendants was placed on the record out of the presence of the jury.) Specifically, the court stated that they were entitled to a fair time and opportunity to discover the hazard existing on the premises. In this regard, the evidence indicated that the corporate defendant, Ludwig Honold Properties, Inc. purchased the farm in question on July 31, 1964, from one Curtis Cohee who had owned it for approximately 29 years prior thereto. The corporate defendant then leased the main farmhouse and the attending outbuildings to the individual defendant, Ludwig Honold, who moved into the main farmhouse around the middle of August of 1964 and approximately three weeks prior to the accident. Testimony from defendants in this regard was that they didn't even realize that they owned the wires in question. The electric company themselves admitted at the time of trial that there was nothing that Honold could do about the flow of electrical current. Further, there was testimony that the previous owner had indicated that there was no problem with the electrical system, and there is nothing in the record to indicate any notice or knowledge on the part of these defendants of the dangerous condition.

In view of the above, the court is of the opinion that it properly left to the jury whether or not these owner defendants had reasonable time in which to

discover or correct the alleged defective condition. See Schrull v. Philadelphia Suburban Gas & Electric Co., 279 Pa. 473, 124 Atl. 141 (1924).

Defendant also alleged that error was committed by the court in allowing Doctor Verzilli to testify on the subject of the economic growth rate as applied to plaintiff's impaired earnings. Defendant contends that this had the effect of increasing the earnings claim by an inflation rate. A review of the charge, however, indicates that the matter was clearly explained to the jury. Further, the economic growth rate has been used by our courts and has been approved. See Magill v. Westinghouse Electric Corp., 464 F. 2d 294 (3rd Cir., 1972).

Defendant also raises objections to the testimony of several other witnesses. However, the court is of the opinion that they are without merit and will not be mentioned. We, therefore, enter the following

### ORDER

And now, January 3, 1975, it is hereby ordered and decreed as follows:

1. The motion for judgment n.o.v. filed on the above matter on behalf of defendant, Philadelphia Electric Company, be and the same is hereby dismissed.

2. The motion for a new trial filed on behalf of defendant, Philadelphia Electric Company, in the above matter, be and the same is hereby dismissed.