Gertrude SHENANDOAH, Administratrix
of the Estate of Leroy
Shenandoah, Deceased

v.

CITY OF PHILADELPHIA et al.

Civ. A. No. 72–2388.

United States District Court,
E. D. Pennsylvania.

Dec. 20, 1976.

Harry Lore, Philadelphia, Pa., for plaintiff.

Murray Goldman, Asst. City Sol., Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

The plaintiff in this action is the mother of the late Leroy Shenandoah. She is also the Administratrix of his estate, pursuant to letters of administration issued by the Register of Wills of Philadelphia County. The decedent was shot and killed by a Philadelphia police officer on March 2, 1972, during a confrontation which occurred on a balcony-fire escape of a center city hotel in front of numerous witnesses. For reasons which have never been explained, decedent lay on the balcony for some time after the shooting without any medical attention whatsoever. When the police finally brought him to the emergency room of a hospital two blocks away, he was pronounced dead of shock due to loss of blood. He had been shot five times.

The original Complaint asserted a civil rights claim on behalf of the decedent's estate.[1] Subsequently, plaintiff amended the Complaint to add claims arising under the Pennsylvania survival and wrongful death statutes (20 Pa.C.S.A. § 3371 and 12 P.S. § 1601 et seq., respectively). The state claims are not merely pendent to the federal civil rights action; they are properly before the Court by virtue of the parties' diversity of citizenship. 28 U.S.C. § 1332.

Shortly before the case was scheduled to proceed to trial, the parties began, at my suggestion, to explore in earnest the possibility of settlement. Because the case entailed numerous issues which I would be called upon to decide at trial, I did not participate in settlement negotiations, but turned the role of mediator over to my colleague Judge Edward R. Becker. Through his diligent efforts and the cooperation of counsel, the parties agreed to settle the case for $130,000. Judge Becker memorialized the settlement in a Memorandum filed June 2, 1975. He did not attribute the settlement to any single claim or divide the

---

1. Under applicable state law, 20 Pa.C.S.A. § 3371, actions for personal injury survive the death of the plaintiff. The federal Civil Rights Act incorporates this survival provision to permit an action for denial of civil rights to be brought by the personal representative of the victim's estate. *Brazier v. Cherry*, 293 F.2d 401 (5th Cir.), *cert. denied*, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Strickland v. City of Easton*, C.A. No. 75–93 (E.D.Pa., Oct. 27, 1976).

fund between or among the various causes of action asserted in the Amended Complaint, although he did suggest that plaintiff's negligence claims were a good deal stronger than her civil rights theory of recovery.

On June 26, 1975, plaintiff petitioned this Court for approval of her proposal for distribution of the settlement proceeds. She urged that, after deduction of costs and counsel fees, the entire fund be given to her husband and herself, as decedent's parents,[2] "pursuant to the usage, practice, law and custom of the Onondaga Tribal Nation. . . ."[3] On June 30, 1975, an objection to the petition was delivered to my office, in the form of a letter from counsel for one Ann Bush Schenandoah LaForce.[4] To my knowledge the objection was never formally filed with the Clerk of the Court. The gist of the letter was that Mrs. LaForce had married the decedent in 1957 and remained his "legal" wife until he died. (She remarried in 1973.) She claimed a surviving spouse's share of the settlement proceeds (relying on Pennsylvania law) and requested a hearing on the petition to permit the presentation of evidence in support of her claim. I granted the request and set the matter down for hearing on July 11, 1975.

At the hearing, Ann LaForce testified that she and the decedent lived together as spouses "at least" during the last seven months of his life and that they had done so, although intermittently, for the bulk of their marriage. She attributed the sporadic nature of their cohabitation to decedent's migratory employment pattern; he often lived for months at a time in different cities while employed as an ironworker on bridge and skyscraper construction projects. Several of Mrs. LaForce's relatives and acquaintances testified in support of her claim. Also at the hearing, and apparently for the first time, Mrs. LaForce asserted a claim on behalf of Mitchell David Shenandoah, a child born to her in 1967, on the theory that he was the legitimate issue of her marriage with decedent and, as such, entitled to share in the settlement proceeds.

The plaintiff and her witnesses bitterly disputed this evidence. According to them, Ann LaForce deserted her husband in 1964 while he was serving in the military, and never again lived with him as his wife. Her son, they charged, was fathered by another man, and her egregious misconduct in the form of abandonment and adultery, was such that she had forfeited any right to claim a share in her husband's estate or the proceeds of an action for his wrongful death.[5] In support of this argument they pointed out that at a "Dead Feast" held shortly after decedent's death, the Onondaga tribal council had distributed decedent's real and person effects to his parents, and that Mrs. LaForce, who within several days of the death had visited the reservation and taken possession of a snowmobile which she claimed to have purchased jointly with the decedent in February 1972, was prevailed upon by the tribal council to return that item to decedent's parents in accordance

2. It is clear that the plaintiff is motivated by a sincere desire to insure that the money is used for the benefit of all of the decedent's children, rather than from any desire for self-benefit.

3. One of the dramatic features of the case, which attracted much public attention, was that the decedent was a member of the Onondaga Nation, an Indian tribe with a long and illustrious history. At the time of his death, Shenandoah was living on the Onondaga reservation in Nedrow, New York, at the home of his parents. He worked in Philadelphia on weekdays as an ironworker, and spent his weeknights at the hotel where he was killed.

4. In her post-hearing briefs and in several legal documents dating from her marriage to decedent which were filed as exhibits in this proceeding, Ann LaForce used the spelling, "Schenandoah," So did the plaintiff, in her petition for letters of administration. Decedent himself spelled it "Shenandoah," and that is the version which appears in the Complaint. I gather that either spelling is acceptable, but I find it curious that the spouses themselves seem to have differed as to usage.

5. In part the family's position has been vindicated. Shortly after the July 11 hearing, Ann LaForce withdrew her claim on behalf of her son, when blood tests conclusively established that the decedent could not possibly have fathered the child.

with the decree of the Dead Feast.[6] Alternatively, plaintiff argued that Mrs. LaForce had forfeited her rights as surviving spouse under the laws of New York or Pennsylvania, whichever this Court deemed controlling, if it were not persuaded to follow Indian law. In further rebuttal to Mrs. LaForce's evidence on the issues of cohabitation and condonation two sisters of the decedent testified that, for the last five years of his life, their brother lived, not with his legal wife, but with a series of two other women, and that each of these liaisons produced a child and appeared to be an exclusive relationship while it lasted.

At the close of the hearing of July 11, I made several observations from the Bench which I specifically addressed to the parties as well as their attorneys. I said, first, that this bitter intrafamily dispute struck me as unseemly and was a dishonorable reflection upon the decedent's memory. I then urged the parties to agree upon a sensible, fair distribution of the settlement fund, one which would achieve the equity that "Mr. Shenandoah presumably would have wanted were he still alive." (Tr. 194.) Thereupon, I adjourned the hearing, but agreed to leave the record open for a suitable period of time to permit the filing of additional evidence.

At the parties' request, a second hearing on this matter was held on September 29, 1975, at which time both sides filed supplemental documents and produced new witnesses. Among the witnesses produced by the plaintiff at the second hearing were Roseanne Shenandoah and Deena J. Shenandoah. It was decedent's relationships with these two women about which his sisters had testified at the first hearing.

In the course of the hearing on September 29, Ann LaForce admitted that it was biologically impossible for decedent to have fathered her son Mitchell. She also conceded that Roseanne Shenandoah was the mother of decedent's son, Marcus Lee Shenandoah (born in Ohio in 1969), and that Deena J. Shenandoah was the mother of decedent's daughter, Melinda Jill Shenandoah (born in New York in 1971). Mrs. LaForce admitted that in 1971 and 1972, up to the time of his death, decedent "lived with" Deena J. Shenandoah, but insisted that he also "lived with" her (Ann LaForce) during that time.

The parties rested at the end of the hearing on September 29, and in the course of final argument I asked counsel to submit post-hearing briefs addressed to the following issues: whether the widow, Ann LaForce, had forfeited her right to share either in the decedent's estate or in the proceeds of the action for his wrongful death; whether the settlement fund should be characterized as the proceeds of either action, or both (and, in the latter case, in what proportions);[7] and what form the distribution would take, under the laws of New York and of Pennsylvania, in any and all of these hypothetical situations.[8]

In this Memorandum and Order I will authorize distribution of the settlement proceeds, but not as proposed by the plaintiff. My conclusions, discussed more fully below, are as follows: (I) The settlement fund should be attributed solely to the action for wrongful death; (II) New York law, not Pennsylvania or Indian law, governs distribution of the wrongful death proceeds and determines the widow's right to share in

6. To explain the religious and legal character and import of the Onondaga Dead Feast, and its possible application in the present case, both as to ultimate distribution of the proceeds and as to the status of the widow, plaintiff produced an expert witness whose views were enlightening, although not wholly persuasive or dispositive. It is certainly true to say that, in the eyes of the Shenandoah family and the Onondaga tribal council, Mrs. LaForce and the decedent had not been "husband and wife" for quite some time. This and other factors bear-

ing upon the issue of forfeiture are discussed in Part III of this Memorandum.

7. I also solicited the views of counsel as to whether any portion of the fund should be attributed to the civil rights action, and, if so, whether that amount should be characterized as survival or wrongful death proceeds.

8. I took under advisement, with no need for additional briefs, the parties' arguments on the question of whether Indian law should control.

those proceeds; (III) under New York law, Ann LaForce does not qualify as a surviving spouse and is not, therefore, a statutory beneficiary of the action for wrongful death; and, finally, (IV) the persons entitled to share in the wrongful death proceeds, in the amounts set forth in the Order of distribution, are decedent's two minor children and his parents.

## I. Characterization of the Fund

■ The parties are in accord in submitting to this Court for decision, as a matter of discretion, the allocation of the proceeds of the settlement among the three causes of action asserted in the Amended Complaint. In my view, the proper starting point for this determination is an analysis of the basis upon which the settlement was reached, and not necessarily an independent evaluation of the merits of the various causes of action asserted. Moreover, since we are concerned primarily with matters of distribution of the proceeds, no useful purpose would be served in attempting to explore the extent, if any, to which the measure of damages for a civil rights violation might exceed the measure of damages, under state law, for the tort which constituted the violation of civil rights. It is apparent that the settlement assumed that the measure of damages would be substantially identical. It is also reasonably clear that Judge Becker regarded the tort cause of action under state law as the cause of action upon which the defendants were most vulnerable; his views are entitled to great weight in these proceedings. Moreover, it is reasonable to conclude that the defendants' payment of the settlement was more probably viewed by them as an acknowledgement of potential liability for negligence, than for a violation of the constitutional rights of the deceased. For all of these reasons, I have concluded that there is no necessity for assigning a separate value to the civil rights claim.

It bears emphasis that this is not a case, like *Strickland v. City of Easton, supra,* which poses the question of whether the civil rights claim does have value irrespective of the settlement or other disposition of the state claims. Rather, this is a case in which the parties, for purposes of distribution, are willing to assume that the measure of damages for an unconstitutional deprivation of life is essentially the same as for tortious deprivation of life. The significant issue in the present case is the proper apportionment of the settlement proceeds as between the survival and wrongful death actions.

■ In nature and purpose, these two actions are "entirely dissimilar," notwithstanding their common roots in the law of negligence. *See Pezzulli v. D'Ambrosia,* 344 Pa. 643, 647–48, 26 A.2d 659 (1942). While the survival action compensates the decedent's estate for various categories of damage sustained by that person alone, the wrongful death action is designed solely to deal with the economic impact of the death upon those who were dependent upon the decedent during his lifetime. Had this case been tried, the two actions would have been consolidated for trial, Pa.R.Civ.P. 213(e), but the jury would have been required to bring in separate verdicts, *Frankel v. Burke's Excavating, Inc.,* 223 F.Supp. 945 (E.D.Pa.1963).

■ Recovery under the survival action is limited to compensation for conscious pain and suffering, medical expenses, and the present value of the difference between decedent's gross earnings had he survived, and his lifetime expenditures for his own support and for the support of his dependents. *See Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971). The interval between injury and death was quite brief; there was little or no evidence of conscious pain and suffering; there is no evidence of significant medical expenses; and, of course, there was no loss of earnings between injury and death.

■ The decedent was 32 years old at the time of his death, and had a life expectancy of approximately 34.9 years. He was earning $12,000 per year, at the wage levels then prevailing. Since his death, the union of which he was a member has secured at

least one additional·increase. On the other hand, decedent had experienced many periods of unemployment, as might be expected in the construction industry. More significantly, it is clear that throughout his working life, the decedent's expenditures for his own living expenses and for the support of his family, always seemed to consume his entire income.

Thus, as a practical matter, the pecuniary losses suffered by the statutory beneficiaries clearly constitute the major portion of the damages sustained. These losses, together with the funeral expenses, are recoverable only in the wrongful death action. *Skoda v. West Penn Power Co.,* 411 Pa. 323, 191 A.2d 822 (1963).

I have therefore concluded that the entire settlement should be attributed to the wrongful death action. Two additional factors may be mentioned which, while not relied upon as reasons for this decision, are nevertheless additional advantages: By allocating the entire proceeds to the wrongful death action, it is possible to avoid questions of administration and taxation of the decedent's estate and, as will be discussed below, other legal problems of great difficulty and complexity, *viz,* the inheritance rights of acknowledged illegitimate children not subject to formal filiation proceedings, and the possible applicability of tribal law to intangible assets of a decedent's estate.

## II. *Choice of Law*

■ For all practical purposes, exclusion of the federal civil rights action from this settlement leaves the case purely a diversity matter, in which choice of law is governed by the law of the forum. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania law on this subject is consistent with the "grouping of contacts" approach taken by the American Law Institute in its *Restatement of Conflicts 2d* (see esp. §§ 6, 145, 175, and 177), according to which the court must weigh the relative interests of each concerned state in the outcome of the particular issue to be decided. *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964).

The choice of law to be made in *Griffith* involved limitation on damages in a survival action for breach of contract. Decedent, a domiciliary of Pennsylvania, was a passenger in defendant's plane, which crashed in Colorado. Colorado law imposed an arbitrary limit on damages recoverable in such a case; Pennsylvania law did not. The action was brought in Pennsylvania, where decedent's surviving dependents were domiciled. Under these circumstances, the Pennsylvania Supreme Court held, Pennsylvania law should apply to afford "full recovery" of damages, because of that state's vital concern "with the administration of decedent's estate and the well-being of the surviving dependents." 416 Pa. at 25, 203 A.2d at 807. This holding marked the abandonment, in Pennsylvania, of the choice of law doctrine of *lex loci delicti,* according to which the law of Colorado automatically would have applied to all issues in the case.

■ The choice of law doctrine enunciated in *Griffith* contemplates, in an appropriate instance, the application of the law of different states to different issues in the same lawsuit. *See, e. g., Gillan v. Gillan,* 236 Pa.Super. 147, 345 A.2d 742 (1975) (law of state where separation agreement was entered into applies to issue of collusion, but law of parties' present domicile governs enforceability). If, for example, the present case had proceeded to trial and verdict, Pennsylvania clearly would have had the paramount interest in issues relating to standard of care and ultimate liability, *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970); *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19 (3d Cir. 1975). But that would not have affected choice of law as to other issues in the case, including the ones presently before the Court in this settlement proceeding. *Scott v. Eastern Airlines, Inc.,* 399 F.2d 14 (3d Cir.), *cert. denied,* 393 U.S. 979, 89 S.Ct. 446, 21 L.Ed.2d 439 (1968). Choice of law as to those issues requires an independent inquiry, and, where appropriate, a different result. *Griffith v. United Air Lines, supra.*

*Accord, Satchwill v. Vollrath Co.,* 293 F.Supp. 533 (E.D.Wis.1968) (following the *Restatement* approach in an action for wrongful death, *lex fori* governed as to liability and damages but law of beneficiaries' domicile controlled distribution of proceeds).[9]

■ Both of the issues to be decided in this proceeding involve matters of vital concern to the State of New York and of minor interest to Pennsylvania. One is the legal status of the widow, Ann LaForce. Her marriage to decedent was contracted in New York in 1957, and her alleged act of abandonment is said to have occurred in that state. Pennsylvania law recognizes the paramount interest which New York has in the resolution of this marital issue. *McSwain v. McSwain,* 420 Pa. 86, 215 A.2d 677 (1966); *Zurzola v. General Motors Corp.,* 503 F.2d 403 (3d Cir. 1974). Likewise, New York has a more significant interest than Pennsylvania in the distribution of the wrongful death proceeds. Decedent was domiciled in New York at the time of his death, as were all but one of the statutory beneficiaries.[10] This, alone, is enough to support the application of New York law to issues relating to distribution. *Griffith v. United Air Lines, Inc., supra.* Moreover, New York has profound interest in the case by virtue of its special relationship with the Onondaga Nation. The combination of these factors vastly outweighs Pennsylvania's interest in the matter.

■ For all of these reasons I am persuaded that, under Pennsylvania choice of law principles, the status of the widow and the distribution of the settlement proceeds should be determined according to New York law. This decision, however, raises a secondary problem: Would the courts of New York, looking to the decisional law of that state, apply Onondaga law, rather than state law, in resolving the issues presented in this case?

Plaintiff has made a vigorous, well-researched argument in favor of the application of Onondaga law. Specifically, she contends that the entire proceeds of this settlement should be distributed to her husband and herself and that the widow should be disqualified, pursuant to the decree rendered at the Dead Feast held on the reservation shortly after decedent's death. She relies principally on cases which apply Indian law in situations involving intestate succession, adoption, and child custody. For purposes of this discussion I am prepared to assume that in one or more of these areas New York courts would defer to Onondaga law.[11] But in the context of a statutory

**9.** New York choice of law doctrine, on which the Pennsylvania Supreme Court explicitly relied in *Griffith,* also supports this policy-oriented, fragmented result. *See, e. g., In re Robinson's Estate,* 66 Misc.2d 167, 319 N.Y.S.2d 932 (1971) (*lex loci delicti* applies to issues of substantive liability, but law of beneficiaries' domicile governs distribution of proceeds, in light of latter state's more significant interest in that issue). The courts of both states recognize that the predominant governmental interest to be served by distribution of wrongful death proceeds is that of the state in which all, or principal, beneficiaries reside. *Griffith v. United Air Lines, supra; In re Estate of Caccamo,* 71 Misc.2d 391, 336 N.Y.S.2d 77 (Surr.Ct.1972).

**10.** The exception is decedent's son, Marcus Lee Shenandoah, who on the date of his father's death (the operative date for purpose of fixing domicile) was domiciled either in Ohio or Pennsylvania; the record is ambiguous. Decedent's parents and the widow were New York domiciliaries on that date and remain so today. His daughter, Melinda Jill, also was domiciled in New York at that time but now lives in California. For purposes of this proceeding she is considered a domiciliary of New York. *Gore v. Northeast Airlines, Inc.,* 373 F.2d 717 (2d Cir. 1967).

**11.** It seems undisputed, for instance, that "from time immemorial," distribution of the real and personal property of a deceased Onondaga Indian who resided on the reservation has been governed by the Onondaga Dead Feast, rather than by the New York law of wills and intestate succession. *Lyons v. Lyons,* 149 Misc. 723, 268 N.Y.S. 84 (1933), *aff'd,* 244 App. Div. 759, 279 N.Y.S. 1020 (1935) (tribal council's decision controls, even where it contradicts terms of deceased Indian's will). Even in this area of greatest deference to Onondaga ritual, however, it is unclear whether the *Lyons* holding would extend to property located off the reservation. See testimony of Prof. Oren Lyons, 7/11/75, N.T. at pp. 170–77. That issue is not before me, because the proceeds of action for wrongful death are not, in any event, part of the decedent's estate.

action for wrongful death a different result obtains.

◼ The New York statute which established the cause of action for wrongful death has no counterpart either in common law or in the customs of the Onondaga Nation. On this subject, therefore, there is no true "Indian law" to apply. Thus, even on relatively minor procedural issues arising under the wrongful death statute, the courts of New York consistently have refused to give any legal effect to purported "decisions" by the Onondaga tribal councils. *Hill v. Shafty,* 121 Misc. 273, 201 N.Y.S. 29 (1923) (despite Dead Feast "ruling" that she was owner of her deceased husband's estate, Onondaga widow could not bring action for wrongful death in her individual capacity, but only upon court appointment as administratrix); *Crouse v. New York State Rys.,* 124 Misc. 780, 209 N.Y.S. 264 (1925) (Dead Feast council has no power to appoint administratrix). Given these authorities, I cannot accept the proposition that Onondaga law should determine the key substantive issues of whether decedent's widow qualifies as a statutory beneficiary of the action for wrongful death, and to whom and in what proportions the proceeds should be distributed. The law of the State of New York, not Indian law, therefore will be applied in this case.

### III. *The Status of the Widow*

Section 5–4.4 of the New York Estates, Powers & Trusts Law (EPTL) provides that damages recovered in an action for wrongful death or by settlement of such an action "are exclusively for the benefit of the decedent's distributees and, when collected, shall be distributed to the persons entitled thereto" under New York rules of intestate succession (EPTL § 4–1.1). A surviving spouse is, of course, such a distributee. The question is whether the widow in this case qualifies as a surviving spouse.

Section 5–1.2 of the EPTL provides in pertinent part:

"A husband or wife is a surviving spouse within the meaning of, and for the purposes of 4–1.1 . . . and 5–4.4, unless it is established satisfactorily to the court having jurisdiction of the action or proceeding that: . . . (5) The spouse abandoned the deceased spouse, and such abandonment continued until the time of death."

◼ The party (here, the plaintiff) seeking to disqualify the husband or wife as surviving spouse has the burden of proving abandonment under § 5–1.2(5). *Matter of Maiden,* 284 N.Y. 429, 31 N.E.2d 889 (1940); *In re Loeb's Estate,* 77 Misc.2d 814, 354 N.Y.S.2d 864 (1974). Unfaithfulness *per se* is not a bar, nor is any other ground for separation or divorce, except abandonment. *Matter of Green,* 155 Misc. 641, 645, 280 N.Y.S. 692, *aff'd,* 246 App.Div. 583, 284 N.Y.S. 370 (1935). Moreover,

"something more is necessary than [proof of] a departure from the marital abode or a living apart . . . To amount to abandonment the departure of a spouse from the marital home must be unjustified and without the consent of the other spouse."

*Matter of Maiden, supra,* 284 N.Y. at 432, 31 N.E.2d at 890.

◼ Where there is no proof that the surviving spouse's departure was unjustified and without decedent's consent, or where the evidence shows that the initial parting was by mutual agreement, subsequent misconduct may constitute abandonment and result in disqualification of the surviving husband or wife. *Matter of Oswald,* 43 Misc.2d 744, 252 N.Y.S.2d 203 (1964), *aff'd,* 24 A.D.2d 465, 260 N.Y.S.2d 615 (1965), *aff'd,* 17 N.Y.2d 447, 266 N.Y.S.2d 807, 213 N.E.2d 888 (1965); *Matter of Goethie,* 9 Misc.2d 906, 161 N.Y.S.2d 785 (1957). Generally speaking, the standards used to determine disqualification under § 5–1.2(5) are the same as would have applied had the deceased spouse sought a decree of separation on grounds of abandonment. *In re Lamos Estate,* 63 Misc.2d 840,

313 N.Y.S.2d 781 (1970).[12] As in an action for separation or divorce, proof of abandonment can be rebutted by evidence of reconciliation or condonation. *See*, e. g., *Matter of Sidman*, 153 Misc. 735, 276 N.Y.S. 56 (1934). On that issue, however, the otherwise-disqualified spouse has the burden of proof.

Application of these principles to the record before me in this case compels the conclusion that decedent's widow, Ann LaForce, does not qualify as a "surviving spouse" within the meaning of the wrongful death statute. She has no standing, therefore, either to object to plaintiff's petition for distribution or to claim a share of the settlement proceeds.

Much of the evidence presented in this case was contradictory and self-serving. Many of the witnesses had a keen interest in the outcome, and on certain major issues the contestants' evidence was utterly irreconcilable. On the whole, I found Mrs. LaForce to be less credible a witness than Roseanne Shenandoah and Deena Shenandoah, who appeared on behalf of plaintiff and whose testimony conflicted most sharply with that of the widow. For this reason, and because of the persuasive documentary evidence which was presented in support of plaintiff's "version" of the history of decedent's marriage to Ann LaForce, I resolved virtually all of the contested issues in plaintiff's favor. The following findings of fact, presented in summary narrative form, should suffice to explain and support the conclusion I have reached:

Decedent married Ann Bush on April 5, 1957. Both were teenagers who had grown up on the Onondaga reservation in Nedrow, New York. They lived together as husband and wife, from April 1957 through March 1962, in various cities where decedent was employed as an ironworker. Decedent was drafted into military service in April 1962. At that time he and his wife were living at the home of her mother, Ruth Bush, on the Onondaga reservation. When decedent was drafted his wife stayed on at the Bush home.

Decedent was discharged from the military service in mid-1964. Several months earlier, his wife had moved out of the home they had shared on the reservation and into an apartment in the City of Syracuse several miles away. She left decedent's clothing and personal effects behind. These were retrieved by one of decedent's sisters, who brought them to the home of decedent's parents, also on the reservation, for safekeeping.

Between 1964 and her remarriage in 1973 after decedent's death, Ann Shenandoah lived in a series of apartments in Syracuse with various acquaintances and relatives. After his discharge from military service decedent resumed his employment as an ironworker, which often took him to different parts of the eastern United States for weeks or months at a time. During his sojourns in the Syracuse area, however, he lived on the reservation at the home of his parents, not with his wife.

This marital separation, whether consensual or otherwise, was followed by conduct on the part of both spouses which clearly demonstrated their mutual lack of interest in and commitment to their marriage and each other. On March 1, 1967, for example, Ann Shenandoah gave birth to a child,

---

**12.** This rule was formulated at a time when abandonment was a ground for separation in New York but not for divorce. Under current New York law, abandonment is a ground for divorce. "Justification," *i. e.*, proof of the plaintiff spouse's own misconduct, has long been a statutory defense to an action for separation on the ground of abandonment. *Domestic Relations Law* § 202. It is not, however, a defense to an action for divorce, except where divorce is sought on grounds of adultery. *Gleason v. Gleason*, 26 N.Y.2d 28, 308 N.Y.S.2d 347, 256 N.E.2d 513 (1970). Although I have found no case directly on point, it would seem that the *Lamos* rule, if applied literally, could preclude disqualification where there is proof of mutual abandonment, *i. e.*, where either spouse could have been barred from obtaining a decree of separation on the ground of abandonment because of the justification defense, even though a decree of divorce could have been secured on identical proof. *See*, e. g., *Matter of Green, supra*. My own view, which is consistent with the approach taken in the *Gleason* case, supra, is that mutual abandonment should result in disqualification of both spouses, rather than neither. *Accord, Archer Estate*, 363 Pa. 534, 70 A.2d 857 (1950).

Mitchell, who was fathered by another man. At the hospital she told attending medical personnel that she was unmarried. Later that year, on December 15, 1967, decedent entered into a ceremonial marriage (albeit void) with one Roseanne Pitzerell in Apollo, Pennsylvania. He lived with her, as "husband and wife," through mid-1970. She did not know he was already married. Their son, Marcus Lee Shenandoah, was born in Euclid, Ohio, on December 1, 1969. A driver's license issued to decedent by the State of Ohio in March 1970 shows his residence as 15814 Mandalay Ave., Cleveland, Ohio. The same address appears on Marcus' birth certificate and on birth announcements which his parents dispatched to friends and relatives.

In or around April 1970, decedent abandoned Roseanne and began living with a woman named Deena J. Russi. They lived for a time in a suburb of Philadelphia while decedent was employed on a construction project in that city, but spent the summer of 1970 working in an apple orchard in Central New York and living on the reservation at the home of decedent's parents. In April 1971 they left Pennsylvania and moved back to the reservation. Their daughter, Melinda Jill Shenandoah, was born in Syracuse on July 19, 1971. Her parents made no effort to enter into a ceremonial or common-law marriage, although there was talk of divorcing Ann, and Deena began using the name "Shenandoah."

There is no evidence that either decedent or his wife ever attempted to obtain formal dissolution of their 1957 marriage. On December 6, 1971, they co-signed a retail installment agreement to purchase a snowmobile; it was to be delivered to the reservation in Nedrow, where decedent was living with Deena and their infant daughter. The spouses' joint effort on this purchase was necessitated, apparently, by New York law requiring the signature of both husband and wife on such documents.

On February 14 and 16, 1972, Ann Shenandoah signed several documents at a Syracuse bank relating to an application for a personal loan. Her husband's purported signature also appears on those papers. It uses the spelling "Schenandoah," contrary to decedent's habit, does not resemble his signature as it appears on a multitude of other documents in the record, and was allegedly penned on dates on which decedent himself was working in Philadelphia on a construction project (as evidenced by time sheets which he, as foreman, filled out to certify the hours he and his crew worked on those days).

On March 2, 1972, decedent was shot and killed by a Philadelphia police officer. His mother, not his widow, gave the funeral home a deposit for his funeral expenses, and, acting on behalf of the estate, applied for and obtained social security survivor benefits for the two children, Marcus and Melinda.

These facts compel the following conclusions of law:

1. Plaintiff has not carried her burden of proving that Ann LaForce's departure from her marital home in 1964 was unjustified and without the consent of her husband. Accordingly, there was no "abandonment" at that time. *Matter of Maiden, supra.*

2. Assuming that the spouses initially parted by mutual consent, their subsequent, mutual misconduct resulted in the abandonment of each by the other, for which either could have secured a judgment of divorce after 1970 (when the New York divorce statute was amended to include abandonment as a ground for divorce). *Gleason v. Gleason, supra; Matter of Oswald, supra; Matter of Goethie, supra.*

3. Plaintiff has carried her burden of proving that Ann LaForce "abandoned the deceased spouse, and [that] such abandonment continued until the time of death." EPTL § 5–1.2(5).

4. Ann LaForce has not carried her burden of proving condonation or reconciliation. *Compare Matter of Sidman, supra.*

5. Ann LaForce does not qualify as a surviving spouse under the New York wrongful death statute.[13]

## IV. *Distribution of the Fund*

The New York wrongful death statute provides that damages recovered in such an action, or by settlement thereof, "are exclusively for the benefit of the decedent's distributees and, when collected, shall be distributed to the persons entitled thereto under 4–1.1 and 5–4.5 . . . in proportion to the pecuniary injuries suffered by them." EPTL § 5–4.4(a)(1). The court having jurisdiction of the action makes the determination of pecuniary injury under this section. Persons seeking to share in the recovery must prove (1) that they are statutory distributees of the decedent; and (2) that they sustained pecuniary loss because of his death. The putative distributees in the present case are decedent's parents, Gertrude and Sanford Shenandoah, and his two children, Marcus and Melinda.

### a. *Decedent's Parents*

A decedent's parents are his distributees in an action for his wrongful death. EPTL § 4–1.1. To show pecuniary injury they need not prove that during his lifetime decedent contributed to their support. *Kelley v. Cacace*, 43 A.D.2d 573, 349 N.Y.S.2d 410 (2d Dept. 1973). Under New York law, a parent is considered "a natural object of the decedent's bounty," and where, as in this case, the ties between parent and child endured throughout the child's life, the parent is deemed to have had "a reasonable expectation of receiving some monetary support" from the child and will be given share of the wrongful death proceeds. *Kelley v. Cacace, supra.* On the same theory, a child who was not actually dependent upon a deceased parent may be deemed to have sustained pecuniary injury because of the death. *Gross v. Abraham*, 306 N.Y. 525, 119 N.E.2d 370 (1954).

Decedent's parents have not shown that they were dependent upon their son for financial support during his lifetime, but they clearly were "natural objects of his bounty." During the last year of his life he lived in their home and made contributions to cover room and board for himself, Deena, and their child. Under these circumstances, I am satisfied that decedent's parents suffered "pecuniary injury" by reason of his death. Based on the evidence received at the hearing, I have concluded that they are entitled, jointly, to receive 20 percent of the net settlement fund. The Order of Distribution will so provide.

### b. *Marcus Lee Shenandoah*

Marcus, as the child of a void marriage between the decedent and Roseanne Shenandoah, is legitimate under New York law, *Domestic Relations Law* § 24(1), as well as under the law of Pennsylvania, his present domicile, 48 Pa.S. § 169.1. There is no impediment to his qualifying, under § 4–1.1, as a distributee of his deceased father.[14]

The evidence presented at the hearing of September 29 establishes to my satisfaction that Marcus sustained a pecuniary injury by reason of his father's death. Decedent gave Marcus significant financial support in the first few months of his life. Later, when decedent left Roseanne for Deena, that support diminished. After decedent's death, Marcus and his mother received the proceeds of a small insurance policy, and Marcus currently receives social security benefits as a surviving dependent of decedent. Finally, it is clear to me that Marcus was a "natural object of decedent's

---

13. The same result would obtain under Pennsylvania law, which provides that "a wife who, for one year or upwards previous to the death of her husband, shall have wilfully or maliciously deserted him" forfeits all rights as a surviving spouse. 20 Pa.C.S.A. § 2106(b); 12 P.S. § 1602. The facts set forth above present a clear case of mutual forfeiture under Pennsylvania law. *Archer Estate*, 363 Pa. 534, 70 A.2d 857 (1950).

14. A different situation is presented in the case of Melinda, because of her illegitimacy (*see* Part c, below).

bounty" and, as such, is entitled to share in the settlement proceeds. *Gross v. Abraham, supra*. His loss was greater, in my judgment, than that sustained by decedent's parents. The Order of Distribution therefore will provide that Marcus will receive 40 percent of the net proceeds of this settlement.

### c. *Melinda Jill Shenandoah*

■ Under New York law as it existed on March 2, 1972, when this case of action arose, an illegitimate child could not qualify as a distributee of his or her father, unless:

" . . . a court of competent jurisdiction [had], during the lifetime of the father, made an order of filiation declaring paternity in a proceeding instituted during the pregnancy of the mother or within two years from the birth of the child." EPTL § 4–1.2(a)(2).

Melinda Jill Shenandoah is the decedent's illegitimate daughter, and no order of filiation was entered during the lifetime of her father which would render her "legitimate" under the foregoing section. On its face, therefore, the statute would appear to bar her from sharing in the settlement fund. For two reasons, this is not the case.

First, in several well-reasoned New York decisions this statutory distinction between legitimate and illegitimate children has been overthrown as a denial of equal protection and due process. *See, e. g., Matter of Johnson*, 75 Misc.2d 502, 348 N.Y.S.2d 315 (1973); *Matter of Perez*, 69 Misc.2d 538, 330 N.Y.S.2d 881 (1972); *Matter of Ross*, 67 Misc.2d 320, 323 N.Y.S.2d 770 (1971). These courts opted to "save" the wrongful death statute by expanding it to include illegitimate children.

Second, in 1975 the New York legislature confirmed this judicial construction by amending the EPTL expressly to provide that for purposes of the wrongful death

statute,[15] "an illegitimate child is the distributee of his father." EPTL § 5–4.5. This section has been given retroactive application by at least one New York court. *Eckel v. Hassan*, 87 Misc.2d 1057, 386 N.Y. S.2d 995 (1976).

New York law on this issue could not be more clear, whether one looks to the 1975 amendment or the line of decisions preceding it. Accordingly, Melinda Jill Shenandoah will be considered a legitimate child of her father and his distributee in this action for wrongful death.

■ Of all the distributees, Melinda presented the strongest evidence of pecuniary injury, for she was living with her father, and was being fully supported by him, at the time of his death. Like Marcus, she currently receives social security survivor benefits. Melinda is entitled to 40 percent of the net settlement proceeds.

### V. *Conclusion*

To summarize, the Order of Distribution will provide for payment of decedent's funeral expenses (including reimbursement to the plaintiff for the amount she has paid), costs and expenses of the litigation, and counsel fees, all as prayed for in the petition. The balance will be distributed as follows: 20 percent to the decedent's parents, and 40 percent to each of the decedent's two surviving children. Presumably, guardianships or other appropriate arrangements will have to be made for the protection of the children's shares.

Finally, I would be remiss if I failed to express the Court's appreciation for the diligence, and patience, of counsel, whose dedication to the best interests of their respective clients throughout this unfortunately protracted litigation, has been indeed exemplary.

15. New York retains the filiation requirement of § 4–1.2 with respect to intestate succession. *In re Lalli*, 38 N.Y.2d 77, 378 N.Y.S.2d 351, 340 N.E.2d 721 (1975), *appeal filed*, 45 U.S.L.W. 3077 (75–1148, Feb. 12, 1976). This and several other state decisions relating to restrictions on inheritance by illegitimate persons are currently on the docket of the U. S. Supreme Court. 44 U.S.L.W. 3531, 45 U.S.L.W. 3077.